UNITED STATES

v.

**Kenneth HARRELL, Defendant.**

**No. 02 CR. 136(VM).**

United States District Court,
S.D. New York.

June 3, 2002.

Philip L. Weinstein, New York City, for Kenneth Harrell.

### DECISION AND ORDER

MARRERO, District Judge.

Defendant Kenneth Harrell ("Harrell") is scheduled to be sentenced before the Court on May 31, 2002. By letter brief dated April 1, 2002, the Government moved for an upward departure asserting that either, or both, §§ 5K2.0 or 5K2.7 of the United States Sentencing Guidelines warranted an offense level increase of as much as twelve or more. Harrell opposed the motion by letter brief dated May 13, 2002, argued that a four-level reduction in the Guidelines offense level was justified pursuant to § 2A6.1(b)(4) and contended that mitigating circumstances counterbalance any considerations favoring an upward departure.

For the reasons set forth in the "Statement of the Court," attached and incorporated herein, the Court finds no sound basis to depart upwardly or to reduce the Guidelines offense level for any of the reasons argued by Harrell. Accordingly, it is hereby

**ORDERED** that the Government's motion for an upward departure pursuant to §§ 5K2.0 and/or 5K2.7 of the United States Sentencing Guidelines is DENIED; and it is further

**ORDERED** that defendant's request for a four-level reduction pursuant to § 2A6.1(b)(4) of the United States Sentencing Guidelines is DENIED.

**SO ORDERED.**

### STATEMENT OF THE COURT

The issue before the Court arose from the aftermath of the terrorist attacks on the World Trade Center and the Pentagon on September 11, 2001. At the time these events occurred, many people, understandably overcome and overwhelmed, had difficulty expressing their observations and impressions about them. In seeking a fitting approach to address the matter at hand, this Court similarly faltered. Conventional words and traditional means may not quite suffice to enable us to delve into things associated with the manifold tragedies of that day. Thus, here the Court departs from the customary judicial format to record some observations drawn largely from its own notice and impressions of the events of September 11. These remarks are meant to serve simply as introduction and context for the ruling that follows.

September 11, 2001 may be forever inscribed in our minds and collective experience for all that was transcendent about it. In this regard, two qualities that people generally noted and debated stand out: the absence of what was considered truly comparable prior experience, and the unequaled scale of the whole episode. In fact, so momentous and unique were the dimensions of the events that even our language failed us. Asked to tell what we saw, felt or thought, we groped for ways to describe the sheer magnitude of it all. The entire English lexicon, well endowed as it is, left us at a loss for words to capture the full meaning and enormity of the experience. And so, in our minds, the phenomenon acquired a meaning of its own. It became one of those multi-dimen-

sional things that defines itself by itself, and that in its syllogism mirrors all that it contains, as in God's latent reflection: "I am who am."

Absent a reference point, we enlarged our vocabulary, furnishing the missing content in what was perhaps the simplest terms. Succinctly, we fixed on a point in time. Much of what we mean to say about the enormous events of September 11, 2001 is now contained in a shorthand phrase compressed to the date: "September 11", or simpler yet, whether in words or numerals, "nine-eleven"—as though time stood still momentarily for a snapshot of what it wanted to portray. The day projects many-faceted things. One prominent image defines a multiple of "large", an impression of something twice monumental. The double vision conveys at once the thing perceived and what it concealed, the immense catastrophe and the uplifting spirit that issued from the ashes.

September 11 of course will be remembered foremost for the colossal destruction realized by the terrorist assault on the United States. The ensuing toll encompasses proportions unparalleled for any one event on a single day in our common experience. The whole cost—the deaths and injuries and human trauma, the derivative tragedies and attendant suffering, the vast economic consequences and their multipliers on our social order, the whole disaster broadcast and replayed again and again for all to witness coast-to-coast for several days—is not yet fully known, computed or understood.

One thing we do understand, however: the flipside of the tragedy. September 11 stands for more than the sum of its misfortunes. For, in an odd and also ironic way much of what that day represents is reflected in corresponding dualities also marked by immensity of scale: largeness expanding into largesse. No better sym-

bol reflects these double images than the fallen towers themselves, coupled with all the vital forces that emanated from the rubble to take their place. Simply stated, for every evil perpetrated by the attacks, a parallel good emerged. Just one manifestation of this bounty was the massive outpouring of caring and kindness from all over the country, indeed, all over the world, most of it from strangers moved by nothing more than grace and decency and a sense of fellowship for people in mourning and dire need. Every grief was answered by an offer of solace. Acts of humanity matched each act of depravity. All incidence of selfishness and cowardice elicited an abundance of valor and sacrifice. And for every breach or weakening of our sense of well-being and security there was more than countervailing proof of resolve and resilience that by most accounts made the nation and people even stronger.

Surely, people who ever occasioned to gaze up from the plaza quadrant toward the top of the World Trade Center towers could not help marveling at the massive structures and all they stood for: the precision of those myriad columns in symmetrical rows reaching so ambitiously to the sky; the ingenuity of architecture and engineering the construction displayed; the doubly powerful sight of the edifices so paired dwarfing and dominating everything else surrounding them; the sheer glory and grandeur of the modern wonder it all was.

The September 11 terrorists supplied a converse to that vision, the grotesque side of a double mirror. To engineer and carry out the atrocities which brought down the twin towers required great sophistication in calculated mass destruction, as well as virtually blind devotion to some idea. It demanded extensive planning, studied precision and almost flawless execution to co-

ordinate concerted hijackings of four jet-liners and suicidally to launch them as missiles against the World Trade Center towers and the Pentagon within minutes of each other. In pronounced symbolism not lost on anyone, the brazen mission delivered dual attacks on America's two most vital cities, striking landmarks profoundly emblematic of America's most prominent towers of strength: its prodigious wealth and military might.

The parallel is obvious: the massive creative energies poured into raising immense structures juxtaposed with naysaying drives bent on their destruction; one a society at its peak, reaching ever higher, focused ahead, and dedicated to enlarging its edifice, challenged by outlaws of another culture, a splinter said to be tethered to the past, countering superior power with wanton violence to wreck what the first has built.

Another dimension of the metaphor here comes into play and begins to bring the matter closer to home in this Court. America and its way of life were conceived over two centuries years ago, and built upon the foresight and creativity of its founders. They, too, were resolute. And they, too, inspired by an audacious idea, displayed uncanny sophistication in planning and execution. So moved, they conceived and brought into being a transcendent ambition embodying the very social and governmental values which in time soared as the pillars of strength ultimately materialized in the World Trade Center and the Pentagon.

So, the September 11 terrorists had it wrong in at least one way. Their symbolic strike at the heart of America's military and finance missed the mark. It did little to shake the true sources of the nation's might: its founding principles. Those rudiments, of course, lay below the ground, as bedrock constituted in America's guarantees of individual freedom and democracy; its expansive yet rigorous concept of justice; its fostering of tolerance; its respect for diversity; its embrace as part of its core of all cultures, languages, religions and nationalities. These are the very values, here enshrined and cherished almost to a fault, that the September 11 terrorists exploited, hatching their murderous plot under the shelter of America's liberties and good grace.

Overlooked in their destructive scheme, however, is that whatever its charge, and whether symbolic or real, an assault on our physical plant or citizens targets the effects rather than the causes of America's power, and consequently does nothing to weaken the nation's constitutional structure. That edifice remains intact, unmenaced by any enemy, foreign or domestic, for as long as the moral, spiritual and legal foundation upon which it rests continues to be not only dearly prized but always honored, not just exalted, but lived through unbroken deed, even under the stresses of the most trying exigencies. In so respecting the country's fundamentals, we protect and preserve what our founders envisioned and what we since have enlarged.

Understandably, the attacks on America, on continental American soil, engendered intense wrath and pain. Cries for retribution against those even remotely connected with the assault were commonplace. Equally to no surprise, many people expected and demanded that the perpetrators be brought to justice swiftly and be dealt with as harshly as possible. Such passionate reactions, born of the poignant grief and anger stirred by fresh wounds, are commonplace even when impelled by wrongs of a lesser scale. In response, a number of ways and means the government considered have raised intense political and legal debate, some with constitutional overtones. In essence, the fun-

damental questions ask: To what degree does the domestic reaction to September 11 justify departure from established legal procedures and norms that may affect basic American values and way of life? In the name of security, how much of our civil liberties could we or would we be willing to sacrifice? At the call of survival, how much freedom is too much? What inner part of what we stand for—as a nation, a people, a culture—would we excise if deemed necessary or expedient to do so?

Alexis de Tocqueville, among his many insights on American democracy, remarked that "[t]here is hardly a political question in the United States which does not sooner or later turn into a judicial one," and that "judicial authority [is] invoked in almost every political context." Alexis de Tocqueville, *Democracy in America* 99, 270 (George Lawrence, trans., J.P. Mayer, ed., 1969). The events of September 11 attest to these observations. Not surprisingly, various aspects of the terrorist attacks and their aftermath have begun to reach the courts. The matter now before this Court is but one instance. Without doubt, in the months and years ahead, the debate about the appropriate responses to September 11 is bound to intensify and further unfold before the judiciary as prosecutions and other actual controversies. Myriad cases will present occasions for our courts to pass upon the profound questions that issue directly and indirectly from September 11.

And so, the meaning of September 11 has been squarely introduced for judicial review. Some of the matters the judges are likely to encounter will be infused with the same magnitude and uniqueness that September 11 now defines. *See, e.g., United States v. Awadallah*, 202 F.Supp.2d 55 (S.D.N.Y.2002). They will also be fraught with implications on a correspondingly grand scale. These cases may pose special challenges to the courts, nuances and dimensions that at times may demand even keener sensitivity to the larger stakes than attend the ordinary case. To this extent, September 11 will loom as large for the judiciary as it has for the rest of American society, with one vital difference. For the courts, as the final arbiters of legal disputes over the nation's constitutional values, September 11 litigation may impose a heightened burden.

At minimum, September 11 will try the courts' intellectual resources perhaps as never before, challenging us to parse the real from the bogus or merely perceived, and in so doing to summon powers of discernment and calibrated judgments as delicate as any we have had to elicit at any time in our history. Moreover, in performing their constitutional mandate, the courts will be called upon to exert particular vigilance to safeguard against excess committed in the name of expediency, to ensure that Americans themselves do not succeed where the terrorists failed, inflicting by their own hand the deeper wrongs to the nation's essence that the September 11 external attacks upon physical structures and innocent people were unable to realize. For, as the Supreme Court has noted on occasions arising out of other momentous events in United States history, it is "under the pressing exigencies of crisis that there is the greatest temptation to dispense with fundamental constitutional guarantees which, it is feared, will inhibit governmental action." *Kennedy v. Mendoza–Martinez*, 372 U.S. 144, 165, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963). In short, the September 11 cases will challenge the judiciary to do September 11 justice, to rise to the moment with wisdom equal to the task, its judgments worthy of the large dimensions that define the best September 11 brought out of the rest of American society.

Some of these labors may entwine legal questions tightly within a webwork of political matters that may prove difficult to disentangle. Daunting constitutional perplexities also are sure to arise. No less complex are the philosophical, psychological, and, most critically, the human dimensions of the phenomena with which the legal issues may be meshed.

The questions now before this Court emerge from within these realms. They arise from the wake of the macabre that often trails tragedy, like vultures after carrion— another aspect of the underside captured in our images of September 11. On September 11, 2001, even as the buildings of the World Trade Center burned and entombed thousands of people, we experienced the aftershocks of another brand of terrorism. Amid the extraordinary courage and commitment the rescue mission inspired, the picture was interrupted, punctuated by its perverse antithesis. Mingled with untolled reports of individual and collective valor and unrelenting sacrifice drawn to minister to death, sorrow and pain, and even while the sirens of police, firefighters and ambulances wailed in the background as they rushed to the scene, a grotesque farce, tragic on its own terms, ran a series of malicious pranks.

Dozens of bomb threats were reported. The ensuing scares forced the evacuations of Grand Central Station and the Empire State Building, and the closing of airports, bridges and tunnels. Some bulletins reported people claiming to have received calls allegedly placed from cell phones by a friend or relative buried in the Twin Towers' rubble, news that rushed rescue workers to dig fruitlessly to dashed hopes long after the fabrication. Other items, equally cruel if not unreal, described financial fraud and exploitation. Fake telemarketers, for instance, allegedly called people, especially elderly, to solicit donations of money purportedly to support the rescue effort. Yet other reports fanned xenophobia, inciting a spate of violent hate crimes that, as is the nature of such incidents, did not bother to distinguish friend from foe. On the heels of these events came the anthrax crisis, also with its incidence of real and false accounts.

These acts had deleterious consequences: they diverted energies, resources and attention that should have been channeled to the paramount need—the rescue mission at "ground zero". The frauds spread fear and more instability. People voiced concern over potential looting in some neighborhoods from which the police force had been removed. In the chaos of fear and grief and the frenzy of rapidly moving events, unchecked rumors, misinformation and deliberate falsehoods spread as live news through every means of communication. There was no reliable way to tell apart what was real from what was not, in fact infusing the entire situation with a touch of the unreal. Public officials and community leaders went on the air with special pleas urging people to refrain from such conduct. Even now, months after the fact, shielded and mellowed by as much calm detachment as time and sober reflection can allow to heal our wounds and soothe our grief, we are still staggered by the shock and incomprehension of these recklessly vicious acts.

As the facts emerge, authorities have begun to piece together names with times and places associated with some of these faceless deeds. As the known cases demonstrate, the realities are disquieting. *See, e.g., United States v. Ronald Ferry*, No. 02 Cr. 221 (S.D.N.Y. May 30, 2002); *United States v. Barresi*, No. 01 Cr. 1142 (E.D.N.Y. Jan. 2, 2002); *United States v. Almeida*, No. 01 Cr. 1136 (E.D.N.Y. Apr. 9, 2002). We have learned that many of the acts were by no means the barbarous

work of fanatic strangers with or without a cause, or of religious vandals or fundamentalists in any alien guise or tongue. Rather than foreign terrorists posing as our neighbors, some of these particular actors *were* our neighbors, among them people with names like Kenneth Harrell, the defendant now before this Court—individuals as homegrown as the boy next door, as seemingly sound and without just cause as the brilliant professor and part-time bomber who may be teaching in the adjoining class. Nearly as astonishing as the acts committed are the explanations given. Some of the offenders claim to have intended nothing more than practical jokes—as if the tragedies of September 11 offered anyone anything to laugh about— while others used the occasion to promote personal vendettas or other private agendas. *See, e.g., Ferry,* No. 02 Cr. 221, *Barresi,* No. 01 Cr. 1142; *Almeida,* No. 01 Cr. 1136. Whatever their perverse motivation or design, these acts evidenced the copycat depravity issuing from another font of fundamental violence: the terror housed within the human psyche.

Defendant Kenneth Harrell was accused and pled guilty before this Court on March 1, 2002, of having posted on September 12, 2001 on an internet site accessible to the public a message conveying a plan to bomb the World Series. The full text of the message read:

MY NAME IS ALIK AMAN. IT IS ABOUT TIME YOU AMERICANS GET WHAT YOU DESERVE! THE JOB ISN'T DONE. WE PLAN TO BOMB THE WORLD SERIES AND KNOCK OFF ANOTHER 60,000 AMEREICANS [sic]!

Prior to Harrell's first appearance here on this matter, the Court, in reviewing the charges, considered several questions on which it sought to focus inquiry. What kind of person and what manner of reasons would motivate conduct of this nature? Were the acts embodied in the accusations in any way connected with the terrorist attacks or their cause? Were they products of an unrelated criminal mind or violent character, or of some other profound malice or deviance? Or was the offense driven instead by some mental derangement affecting the defendant's free will? These questions, beyond mere wonderment, generally would bear upon matters concerning a defendant's competence to plead or stand trial and to the appropriate punishment upon any conviction.

Had the Court entertained any preconceptions regarding Harrell or his aims, Harrell's first and later appearances dispelled them. The accused who stood before the Court was not an alien agent draped in a violent ideology, or one moved to violence by anger and hatred indiscriminately targeting Americans. Rather, insofar as surface appearances sometimes may belie the nature of a particular deed, Harrell came across as a palpably introverted, socially troubled individual afflicted by a severe stutter with which he visibly struggled in order to articulate the words necessary for an allocution sufficient to plead guilty to a crime. And the conduct he admitted to was not propelled by any political, religious or dogmatic fanaticism, or even by a personal grievance or feud. The internet threat, he explained, was posted while he was simply "joking around" with another person during an online chat room conversation about the Yankees and the Mets.

The evident incongruities begged for deeper understanding to quell lingering disbelief. If the grave offense Harrell was accused of was actually committed by him, what rational mind would premeditate and carry out such a malicious act solely in jest under the circumstances prevailing on September 11? Were there any circum-

stances—limited mental capacity or even incompetence—that might help explain or mitigate Harrell's behavior?

In preparation for sentencing, the Court sought ways to shed some light on whatever darkness or disturbances might have obscured Harrell's mental state at the time he committed the crime to which he pled guilty. To ascertain that Harrell actually possessed the mental competence necessary to have knowingly engaged in the conduct charged, the Court on its own motion directed that Harrell undergo a psychological examination. An evaluation was performed by Dr. Thomas A. Craffey, a psychologist engaged by the United States Probation Office, following an interview with Harrell on April 5, 2002. The results, though not entirely illuminating or satisfactory in explaining what may have been rational grounds for Harrell's behavior, are nonetheless helpful in persuasively ruling out what were not.

Harrell hardly fits the profile of the hard-core terrorist. He grew up in suburban communities in Pennsylvania and New Jersey, where he was educated through eleventh grade, later completing high school through a General Education Diploma. He then moved to Queens, New York when he was 23 and has since then resided there and maintained steady employment for various laboratories as a lead and asbestos sample analyst. According to the reports by Dr. Caffrey and the Probation Office, Harrell, now 31, began stuttering at the age of 5. The condition has been socially debilitating, resulting in Harrell's immaturity and self-imposed isolation. He regularly works a night shift as a means of minimizing embarrassing social interactions and spends his leisure time attending sporting events and at Internet shopping and chat rooms. According to Dr. Caffrey, Harrell "tends to stay away from more strictly social occasions in which he would be expected to speak with others, and gravitates toward spectator events." Dr. Caffrey's assessment describes Harrell as boyish-looking, shy and immature and displaying ingenuousness or naivete.

Harrell, an avid New York Mets fan, claims that at the time he communicated the threat, he was engaged in a chat with a New York Yankees fan and posted the statement on the ESPN.com N.Y. Jets Internet Message Board. He maintains that he was then "joking around" with the other person and did so because he thought it would be funny. He also alleges that he picked the name "Alik Aman" from a character in a comedy tape to which he listens. He states that soon after he posted the message he realized that it might be taken seriously and therefore attempted to delete it but was unsuccessful.

Harrell argues that there is no indication on this record that had gave much prior thought to the subject of his threat, or that he had any real intention or means to carry out what he claims was an impulsive statement. On these facts, Harrell argues for a four-point reduction in the Sentencing Guidelines calculation pursuant to § 2A6.1(b)(4) on the ground that the offense involved a single threat made with little or no time for deliberation. This adjustment would result in a total offense level of **six**, producing a sentencing range of between **zero and six months** of incarceration.

Furthermore, Harrell contends that there exist cognizable mitigating circumstances in his case that would either permit a downward departure, or counterbalance any factors weighing in favor of an upward departure. First, Harrell claims that the commission of the present offense constituted aberrant behavior and consequently that Guidelines § 5K2.20 would permit a measure of leniency. Second, in

light of Dr. Caffrey's psychological evaluation and of Harrell's history of social isolation, Harrell believes that he may have acted with diminished capacity, thereby warranting a reduction in sentence pursuant to § 5K2.13.

The Government, on the other hand, has moved for an upward departure, urging that twelve levels or more would be permissible. Such a departure would yield a total offense level of **twenty-two or more** and a sentencing range of between **forty-one and fifty-one months** of incarceration. The Government's motion is based on the following contentions:

(1) the significant disruption to governmental functions occasioned by Harrell's conduct;

(2) the heightened gravity of the threat in the context of September 11;

(3) the allegedly racist overtones attendant in Harrell's use of a Middle Eastern name in his posting; and

(4) the importance of deterring such reckless behavior by signaling that those caught will be punished with firmness proportionate to the severity of the offense.

According to the Government, these factors would justify an upward departure pursuant to either Guidelines §§ 5K2.0, 5K2.7, or both.

The United States Probation Office parts company with both the defendant and the Government. Balancing the seriousness of the crime against its observation that Harrell likely poses no future threat to the public, the Probation Office recommends a moderate sentence of imprisonment, followed by supervised release.

Upon close review of the circumstances in the context of the preliminary observations made above, the Court concludes that neither Harrell's nor the Government's position is warranted in determining the punishment appropriate to this case. Neither adequately reflects the proper mixture of unique circumstances and delicate balance of considerations that the situation demands.

■ Harrell does not argue, and there is nothing in the record to support a finding that at the time he communicated the threatening message he lacked competence or possessed significantly diminished mental capacity that would impair his knowing right from wrong. Dr. Caffrey's evaluation in fact satisfied the Court that Harrell possesses, at minimum, average intelligence and that at the time of the act he had some awareness of the seriousness of what he had done.

Against the backdrop of all that had transpired through September 11 and continuing into September 12, including a series of other forms of threats widely reported, the Court is not persuaded that a person of even average intelligence would have acted entirely on impulse in communicating the message Harrell posted on the Internet at 7:23 p.m. on September 12.

In addition, the facts do not support a theory that Harrell's conduct was strictly a spur-of-the-moment thing. By Harrell's own admissions, the content of the message itself, and the name he chose as its pretended source—that of a character from comedy recordings by the "Jerky Boys"—derived from tapes he listened to that were released in 1993 and 1994 and that recorded "real" prank telephone calls. It is particularly notable that Harrell departed from his regular online identity of "Cow Dung," and instead attributed his message to a separate and distinct alias, that of "Alik Aman." These circumstances suggest that Harrell had prior knowledge of such jests and condoned them, at least on tapes, as a source of amusement. That

exposure to prank calls casts doubt on the notion that Harrell's threatening message arose from a purely spontaneous act during a friendly online sports debate with a Yankee fan. Nothing in the content or context of the message gives any indication that it had anything to do with the Yankees' potentially winning the World Series. In fact, Harrell's explanation leaves unanswered whether the threat would have applied even if the Mets had been one of the contenders in the World Series.

Harrell also seeks to dismiss or minimize the difference between verbal and written communication as a vehicle for a threat, arguing that in his case the choice of written form, by reason of his stuttering, reflects his preference to avoid verbal discussions. By the same token, however, a person who spends as much time as Harrell does corresponding by computer, must have extensive knowledge of the range of the audience such communication may reach and the potential permanence of the postings. Harrell's admission that he endeavored to retrieve the message soon after sending it attests to his knowledge that such a written statement made during an Internet conversation are not entirely equivalent to instantaneous verbal remarks to a particular person or even to a group of individuals.

In connection with Harrell's argument that his conduct constituted aberrant behavior, the Court notes that recent events have cast a cloud of uncertainty over such a proposition. Just two weeks ago, on May 14, 2002, Harrell was arrested by the New York City Police Department. The State charges Harrell with computer tampering, possession of stolen property, and theft of services relating to his alleged sale of stolen DirectTV access cards on an internet auction site. The Court acknowledges that the State has yet to prove its case and Harrell has not been convicted of

any crime, but the investigation and arrest of Harrell raise substantial questions as to whether his prolific use of the internet might yet uncover other wrongful conduct that would negate a finding of aberrant behavior here.

Accordingly, the Court finds no sound basis for adjusting the recommended offense level pursuant to Guidelines § 2A6.1(b)(4) or for reducing Harrell's sentence in any way pursuant to §§ 5K2.20 or 5K2.13.

■ With regard to the Government's motion for a significant upward departure from the applicable Sentencing Guidelines range, while the Court acknowledges that pursuant to §§ 5K2.0 and 5K2.7 the Court has the discretion to authorize such a departure, the Court is not persuaded that a departure is appropriate under the circumstances of this case. As a threshold matter, there is no evidence here that it was Harrell's intention to communicate a threatening message designed to be accepted and understood as such by any specific person or limited audience or that it immediately targeted a particular location. And the Government concedes that it found no evidence that Harrell possessed any means or plans to carry out any such threat. Rather, the evidence is more consistent with a finding that Harrell's statement was motivated by what he believed some people would consider funny. Such a belief, in this Court's view, could only emanate from extraordinary immaturity, colossally poor judgment and a distorted sense of humor.

Pursuant to § 5K2.0, an upward departure is authorized where there exist aggravating circumstances "of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission." In that regard, the Government contends that an upward departure is warranted here because (1) by posting his message on the

internet, Harrell broadcasted his threat to a large nationwide group of potential visitors to the ESPN.com website; and (2) the viewers were particularly vulnerable after September 11 to the message's clear insensitivity; and (3) by employing a Middle Eastern alias, Harrell inflamed the anti-Arab sentiment alluded to above.

Although true to an extent, these circumstances differ from those in cases in which courts have found that some upward departure was warranted. In *United States v. Barresi*, No. 01 Cr. 1142 (E.D.N.Y. Jan. 2, 2002), the district court upwardly departed eight levels on the basis of defendant's phone call to the FBI on September 12, 2001, falsely suggesting that a particular Arabic person might have been implicated in the September 11 attacks. The Arabic person so accused was subjected to intense investigation and suffered significant psychological trauma. The defendant, who had a prior criminal record that included violent offenses, had been involved in a personal dispute with that individual and made the false accusations as retaliation connected with that private affair. In contrast, Harrell's message was never intended to target any one individual or group of individuals in such a malicious way.

The Government also contends that a departure under this provision is permitted here by reason of the large number of victims and the special vulnerability of Arab–Americans to the wrath stirred by the September 11 terrorist attacks.

The threat contemplated under Guidelines § 2A6.1 is one made by telephone or mail to a single individual. *See United States v. Adelman*, 168 F.3d 84, 87 (2d Cir.1999). The Government argues that Harrell's threat was made not to a single individual, but "to the entire United States" and "every single person unfortunate enough to view it on the Internet."

While it is true that a threat that extends to numerous victims has been held to justify an upward departure pursuant to § 5K2.0, the cases where it has been sustained involved threats to specific individuals, or by extension of a given threat, to an identifiable group of persons. A threat directed to and actually received by the targeted victim is reasonably certain to instill fear or purposely affect conduct in a manner related to the intimidation. In this Court's view, the aggravating factor introduced by a presumptively larger number of "victims" is mitigated by the indefiniteness of the related threat. Harrell's message, addressed to no particular person but abstractly to "you Americans" and to occur at an indeterminate time and place, cannot be said to target any particular victim. While it is probable that the message may have reached some people who happened to have been logged in to ESPN.com at the time, the Government presents no evidence indicating precisely who or what number of them read the message or how they reacted to it. To be sure, some people, against the backdrop of September 11, would have felt more deeply offended. Given the vagueness of the threat, however, it is conceivable that others would have dismissed it for what it was—one more crank message among the many then accumulating and about which public officials had already warned.

Nor is it persuasive to say that because some Arab–Americans suffered reprisals targeting them in the aftermath of September 11, such persons necessarily were additional "victims" that Harrell's threat was intended to harm. Again, the Government offers no evidence of particular Arab–Americans who felt directly threatened by or who suffered wrongs indirectly on account of Harrell's message.

Harrell's message, although sinister on its face, existed in the nebular confines of

the internet. There is no evidence on the record relating to how long the message remained visible in the chat room, how many people viewed it, who those people were or how they felt. We simply do not know how others were affected by Harrell's message, and therefore, the alleged victims here are altogether different from the specific individuals who suffered tangible and substantial harm in *Barresi* and *Adelman.*

The Government also contends that an upward departure would be warranted under Guidelines § 5K2.7, which permits such an increase in the sentence imposed if a defendant's conduct resulted in "a significant disruption of governmental function." In the present case, there can be no dispute that there was a diversion of governmental resources to investigate Harrell's posting. The investigation here was triggered by an FBI Agent in Houston who promptly notified authorities in New York. All told, the investigation required the deployment of three FBI agents and two New York City Police Officers and lasted eight days. The agents and officers worked with internet service providers to track down Harrell, interviewed numerous related parties and ensured that Harrell did not have the means to carry out his threat. There is also no dispute that this diversion of resources took place at a critical time when the focus should have been on rescue, relief, recovery and investigation of credible threats.

The Court agrees with the Government that, *in the proper circumstances,* an upward departure for significant disruption of governmental functions may be warranted. In *United States v. Horton,* 98 F.3d 313 (7th Cir.1996), the defendant reported a bomb threat to a federal building in Illinois one day after the bombing of the government building in Oklahoma City. The Circuit Court found that as grave as

were the nature and timing of the offense, an eight-level upward departure the district court had adopted was unjustified. Nevertheless, the court acknowledged that because some upward departure was warranted, the case should be remanded for a determination of the proper degree of departure. In *Barresi,* the court also departed upwardly in light of § 5K2.7.

The operative question, then, is whether an upward departure pursuant to § 5K2.7 is warranted in this case. After taking into account the totality of circumstances present in these cases, the Court finds that an upward departure on these grounds would not be appropriate here. In *Horton,* the defendant communicated a specific and viable threat, identifying both time and place for the detonation of a bomb. The threat resulted in the immediate evacuation of the Federal Building in Springfield, Illinois, the closure of fourteen federal agencies, and a frantic search that lasted the remainder of the day. With respect to *Barresi,* the Court has already discussed the severe consequences the defendant's actions had on the Arab–American victim.

In contrast, Harrell's statement was vague in both time and place. To the extent that there were real victims, the record does not reflect the degree of their pain and suffering. The message was published, and then likely perished, on the internet, where it is uncertain who was affected by Harrell's message. Thus, while the courts in *Horton* and *Barresi* confronted very real victims and substantial disruptions beyond governmental functions, this case does not present the same depth of mischief and disruption.

The Court's rejection of the Government's upward departure motion should not be read to minimize the request. Given the widespread pain already occasioned by the September 11 attacks, the Govern-

ment is well within reason to seek to respond firmly to wanton conduct, such as that evidenced here, that only aggravated the effects of massive crimes, thus deepening the wounds and extending the suffering for many more people. The Government urges that failure to punish such acts appropriately, especially when warnings had been issued putting offenders on notice of dire consequences that may attend conviction, would only encourage disregard for the law.

The Court is mindful of these concerns. To them, it adds another layer of interests and considerations. Unduly lenient sentencing in connection with these crimes not only would trivialize the offense, but fail to accord proper respect and recognition to the valid expectations of members of the public who seek that justice done in relation to the scale of September 11 crimes properly reflect the profundity of the sorrow and the solemnity attending the nation's collective September 11 experience. To lightly penalize the related offense is to lightly dismiss the real sufferings of all the victims.

▇▇▇ Recognition of the gravity of the circumstances surrounding September 11 and of the full scope of the interests affected does not mean, however, that we must yield to a reflex to treat every offense and every offender associated with September 11 with indiscriminate severity and weight. The magnitude of a wrong, however profound the hurt, does not relieve us of the obligation to draw distinctions where matters of degree are entailed and where differentiation may be called for. Two bedrock canons that define our jurisprudence are embodied in the principles that the punishment must fit the crime, and that a proper sentence must reflect a fitting match between the offender and the offense. Were we, in the name of avenging wrongs, to requite grief with disproportionately greater grief, and in so doing override the rules our justice system has prescribed precisely to restrain the harmful impulses and excess to which unchecked retribution could give free rein, we would not truly honor the public's legitimate demand for justice in any situation.

The concept of justice may be perceived as a two-edged sword. In any given case, doing justice on one side could equate, by means of one and the same act, to averting an injustice on the other, and vice versa. Proper respect for the interests of all victims of September 11, a class that in some measure encompasses the nation as a whole, suggests that the best way to avenge America's loss is to ensure that in the quality of the justice we render, we honor the principles that remain untouched and unaffected by any of the crimes associated with that day.

In this spirit, the Court concludes that the Government's call for an upward departure that would sentence Harrell to a minimum of almost four years in prison exceeds what is minimally warranted by the circumstances to punish and deter, and does not comport with the larger precepts we should be watchful to protect. Based on the record before the Court, Harrell poses no real threat of violence to anyone, and is not likely to do so in the future. The recurrence of serious criminal behavior on his part is equally improbable. Given his social disability, the long-term prison sentence the Government seeks is far harsher than necessary to serve any rehabilitative purpose. In fact, excessive incarceration, possibly placing Harrell among hardened felons, may cause worsening of his condition. A person who to date has been steadily employed could be driven by excessive trauma to become a public charge.

By the same token, as suggested above, the Court deems it significant to consider

that, by undue leniency in the penalty imposed, Harrell's offense should not be perceived by anyone as behavior to be minimized or condoned. At 31, Harrell is no minor. His education and his regular employment history for the last seven or eight years indicates that he has the intellectual wherewithal to know right from wrong. Despite his debilitating stutter and resulting social awkwardness and isolation, his mental capacity does not seem diminished in any way that would justify relieving him of substantial responsibility for his knowing acts.

Accordingly, the Court adopts the factual recitations and recommendations in the Pre-sentence Investigation Report, with certain qualifications. The Court also adopts the guideline offense level of **ten (10)** and the criminal history category of **one (I)**. Considering the totality of circumstances, as well as the rightful public expectations of and notions of justice proportionate to the demands of September 11, the Court concludes that defendant Kenneth Harrell should be sentenced to a term of incarceration of **six months,** which shall include credit for time served. The Court recommends that the Bureau of Prisons assign Harrell to its minimum security facility at Fort Dix, New Jersey or Allenwood, Pennsylvania. Although the Probation Office noted that the Court has the discretion to recommend confinement in a Community Corrections Center, the Court does not believe that such a sentencing option is appropriate here.