UNITED STATES of America,

v.

**Ali Saleh Kahlah AL–MARRI,**
**Defendant.**

**No. 02 CR. 147(VM).**

United States District Court,
S.D. New York.

Nov. 12, 2002.

Richard M. Jasper, Jr., New York City, for Defendant.

Jonathan Etra, U.S. Atty's Office, Southern District of NY, Asst. U.S. Atty., New York City, for U.S.

### DECISION AND ORDER

MARRERO, District Judge.

Defendant Ali Al–Marri ("Al–Marri") is charged with unauthorized possession of access devices with intent to defraud in violation of 18 U.S.C. § 1029(a)(3). Before the Court is Al–Marri's motion (the "Motion") to: (i) suppress evidence pursuant to Federal Rule of Criminal Procedure ("F.R.C.P.") 12(b)(3); (ii) compel additional discovery pursuant to F.R.C.P. 12(b)(4); and (iii) dismiss the indictment in its entirety. The Government opposes the Motion. On September 5, 2002, the Court conducted a suppression hearing and heard oral argument on the Motion with

regard to exclusion of certain evidence that Al–Marri alleges was unlawfully seized. For the reasons set forth below, the Motion is DENIED.

## I. BACKGROUND

In another case arising from the tragic events of September 11, 2001, this Court acknowledged the monumental challenges the courts will confront as the United States grapples to formulate an appropriate domestic response to the unique threats the nation has encountered in the wake of the terrorist attacks perpetrated on American soil. *See United States v. Harrell,* 207 F.Supp.2d 158, 161–62 (S.D.N.Y.2002). This task, as the Court there noted, will test our ability to balance national security interests with the nation's profound reverence for order and freedom and its enduring defense of individual liberties. Thus, the Court is mindful that special times call for special vigilance, and bid us all to summon our best to function at higher grades of performance in the face of ever greater risks and larger stakes. Insofar as we do not exhaust our stores of courage and continue to pay unremitting respect to America's founding values, we honor the task, serve our traditions, and leave undiminished the legacy under which our nation has flourished over the years: that of freedom guaranteed and guarded by the rule of law.

Against these standards, the Court considers Al–Marri's challenge to the Government's conduct at issue here, to assess whether the Government has lived up to such heightened expectations in the case at bar. The Court is persuaded that the Government has met the test.

## II. FACTS

Al–Marri arrived in the United States from Qatar on September 10, 2001 to enroll in a graduate program in computer science at Bradley University in Illinois, from which he had received a bachelor's degree in 1991. In the wake of the September 11 attacks, the Federal Bureau of Investigation ("FBI") received calls reporting that Al–Marri may have been implicated in possible suspicious activity. In response, FBI agents visited Al–Marri twice at his home in Peoria, Illinois.

At the Court's September 5, 2002 evidentiary hearing on the Motion, Nicholas Zambeck ("Zambeck") and Robert Brown ("Brown"), the two FBI agents who conducted the interviews with Al–Marri and the search of his home and car, testified in person. They stated that during the first visit on October 2, 2001, they asked Al–Marri a series of questions concerning his background, travels, and eventual arrival in the United States. In addition, they inquired about a discrepancy between the date of birth he initially reported to Bradley University and the date he reported later on, asked about certain phone calls he made on his cellular phone, and questioned him as to why his social security number had been assigned to two other people. Al–Marri satisfactorily answered the agents' questions and consented to a search of his steamer trunk, which had been mentioned in one of the leads received by the FBI. The agents then ended the interview. Zambeck gave Al–Marri his business card with instructions to contact the Social Security office, resolve the confusion over his social security number, and then report back to Zambeck. The next day, Al–Marri contacted Zambeck to inform him that he had contacted the Social Security office and had resolved the issue. Zambeck independently confirmed this fact with the Social Security office.

Two months later, at about 4:00 p.m. on December 11, 2001, Zambeck and Brown returned to Al–Marri's home. At the door, Zambeck explained that they had additional questions regarding his date of birth and enrollment at Bradley. It is

undisputed that the agents asked permission to enter Al–Marri's home and he agreed, but Al–Marri asked for a few minutes so he could move his wife, who was in an unveiled state and could not be viewed by men, into another part of the house. The agents allowed Al–Marri to do this, and then entered the house.

Once inside, the agents explained that they wanted to conduct the interview back at their office. They contend that Al–Marri agreed to this request. The agents then asked for permission to look around the house, to which they maintain Al–Marri consented. Al–Marri accompanied the agents as they conducted a search of the apartment room by room.

Upon seeing Al–Marri's laptop computer, which was located on a table in the master bedroom and turned on, the agents asked whether they could take it to their office "to take a look at it" because they did not have the skills nor the time to conduct such an examination at the house. According to the agents, Al–Marri agreed to this request, and proceeded to power the computer down. By the agents' account, as he turned the computer off, Al–Marri suggested that the agents carry the computer in his traveling carrying case. Al–Marri retrieved the case from a closet, placed the computer inside and handed it to the agents. On the table, the agents also saw several CDs and diskettes stored inside a container. They testified that they asked Al–Marri if they could take those as well and that Al–Marri agreed. In addition, the agents claimed that Al–Marri gave them permission to search his car, from which they seized additional items of evidence.

The agents then brought Al–Marri back to their office in order to question him further, and arrived at the office at approximately 4:30 p.m. They brought him to an unlocked interview room, offered him a refreshment, and began the interview by requesting that he sign a consent form indicating he had approved the search. Al–Marri declined to sign the form at that point, and asked the agents to set the form aside for the time being. Towards the end of the interview, the conversation grew contentious, and Zambeck reminded Al–Marri of the consequences of lying to an FBI agent. When the interview ended at approximately 10:00 p.m., the agents asked Al–Marri to return the next day to take a polygraph test to verify the information he had provided. Al–Marri agreed, and then was driven home by the agents. Before he left, Al–Marri asked Brown: "Do I get my computer back tonight?" Brown replied: "No, not tonight."

The next day, December 12, Al–Marri voluntarily returned to the FBI office for the polygraph test. He mentioned that he had spoken to either his lawyer or a representative from his country's embassy that morning. Once he arrived at the FBI office, he refused to take the polygraph test. Later that day, on orders of the United States Attorney for the Southern District of New York, Al–Marri was arrested as a material witness. He was held as a material witness until January 28, when the detention was dropped.

However, inspection of Al–Marri's computer and its carrying case, conducted from December 12 to December 23, revealed credit card numbers and other information and resources that, according to the Government charges, could be used to conduct credit card fraud. In examining the laptop, the FBI made several copies of the hard drive, analyzed the data on the computer to identify both current and deleted files, and scrutinized the internet search engine's bookmarks. These examinations revealed several files related to or containing credit card numbers and expiration dates for those numbers, along with comments on whether such numbers were

still valid. In addition, the FBI found bookmarks to several web sites that could be used to assist a person conducting credit card fraud.

The evidence taken from Al–Marri's computer, in conjunction with other information gathered by the FBI, led to Al–Marri's arrest on January 28, 2002 under an indictment charging Al–Marri with unauthorized possession of access devices with intent to defraud in violation of 18 U.S.C. § 1029(a)(3).

## III. DISCUSSION

### A. STANDARD OF REVIEW

Rule 12(b) of the Federal Rules of Criminal Procedure requires that, prior to trial, a defendant raise any defenses or objections based on defects in the indictment and make motions to suppress evidence or request discovery. *See United States v. Crowley*, 236 F.3d 104, 108 (2d Cir.2000). Rule 12(b) further provides that a motion to dismiss may raise "any defense, objection, or request which is capable of determination without the trial of the general issue...." F.R.C.P. 12(b). Thus, on a Rule 12(b) motion, a court assesses the legal sufficiency of an indictment without considering the evidence the Government may introduce at trial. *See United States v. Alfonso*, 143 F.3d 772, 776–77 (2d Cir.1998). A defendant's first proper opportunity to make motions testing the strength of the Government's proof is at the end of the Government's presentation. *See* F.R.C.P. 29; *see also United States v. Workman*, 397 F.Supp. 562, 563 (S.D.N.Y.1974).

When a defendant raises a contested issue of fact in his pre-trial motion that goes to the validity of a search conducted of his person or property, an evidentiary hearing is required. *See United States v. Harrelson*, 705 F.2d 733, 737 (5th Cir. 1983), *aff'd in part, rev'd in part*, 754 F.2d 1153 (5th Cir.1985) (noting that an evidentiary hearing is necessary to receive evidence of issues of fact that, if proven, would justify relief). If it is established that the search was made without a warrant, the burden shifts to the Government to prove that the warrantless search was conducted pursuant to an exception to the warrant requirement. *See United States v. Kiyuyung*, 171 F.3d 78, 84 (2d Cir.1999).

### B. MOTION TO SUPPRESS EVIDENCE

■ Al–Marri asserts that the Government's seizure of his laptop computer, carrying case and computer disks from his home and certain other items from his car constituted an illegal search and seizure conducted without his consent in violation of the Fourth Amendment of the United States Constitution. Even assuming that he gave consent to the Government to search his home and car, Al–Marri claims that the scope of the consent did not extend to allowing the Government to seize his computer for inspection of its hard drive.

A warrantless search and seizure is "per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Kiyuyung*, 171 F.3d at 83 (quoting *Mincey v. Arizona*, 437 U.S. 385, 390, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978)) (citations omitted) (internal quotations omitted). One such exception applies to consensual searches, which have consistently been approved by courts based on the logic that it is "reasonable for the police to conduct a search once they have been permitted to do so." *Florida v. Jimeno*, 500 U.S. 248, 251, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991).

In the instant case, a dispute exists as to whether Al–Marri gave the FBI consent to search Al–Marri's home. In an affidavit dated June 23, 2002, Al–Marri states that

while he allowed the agents to enter his house upon their request, he was never asked for his consent to search his house or car. (Al–Marri Aff. ¶ 3, 7.) However, Zambeck and Brown both testified before the Court at the suppression hearing, under oath and subject to cross-examination, that they asked for and received Al–Marri's consent to search his home and car. (Transcript of Suppression Hearing, dated September 5, 2002 ("Tr.") at 34, 126–27, 134.) Thus, the Court is presented first with a disputed factual issue that will determine whether the entirety of the search was constitutional.

In deciding whose version of the facts to credit, the Court is unable to form an opinion as to Al–Marri's credibility because he did not testify at the hearing and was not subject to cross-examination. Furthermore, the Court finds the testimony of Zambeck and Brown to be forthright, substantially consistent in all material details, and thus credible. Consequently, this Court follows the lead of other federal courts in valuing the weight of live witnesses' testimony over the contents of a defendant's affidavit, and gives lesser consideration to Al–Marri's version of the facts. *See, e.g., United States v. Juliano*, 2000 WL 1206745, at *5 n. 4 (S.D.N.Y. 2000) (asserting that while defendant's affidavit offers different version of facts from FBI agents' testimony, "because defendant did not testify at the hearing and was not subject to cross examination . . . the Court gives little weight to defendant's assertion."). By accepting the Government's version of the facts, this Court concludes that Al–Marri gave consent to the search of his home, laptop computer and car. Thus, the search and seizure here falls

squarely under the well-delineated consent exception.[1]

The second issue presented to the Court in regard to the search entails a legal question: even if the FBI had consent to search Al–Marri's home, did the extensive search of his computer exceed the scope of such consent? The central requirement of all Fourth Amendment analysis is one of reasonableness. *See Illinois v. McArthur*, 531 U.S. 326, 330, 121 S.Ct. 946, 148 L.Ed.2d 838 (2001). Thus, in measuring the scope of a suspect's consent under the Fourth Amendment, the Supreme Court has imposed a standard of " 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Jimeno*, 500 U.S. at 251, 111 S.Ct. 1801.

In the instant case, the agents asked Al–Marri for permission to search the entirety of his home, and Al–Marri agreed to the search. When the agents asked to take his computer back to the FBI office for further examination, Al–Marri agreed to shut the computer down and even helped put the computer in a carrying case for the agents. Al–Marri did not place any explicit limitation on the scope of the search of his home, car or computer, other than to insist that his wife occupy another room in the house to prevent the agents from seeing her in an unveiled state. *See id.* (noting that the search of a car and paper bag within car was reasonable because of suspect's general consent to search the car without "explicit limitation on the scope of the search.").

Al–Marri would have realized that the examination of his computer would be

---

1. The Court finds the fact that Al–Marri declined to sign a consent form after the search to be irrelevant to the issue of consent, as "it is clear . . . that a refusal to execute a written consent form subsequent to a voluntary oral consent does not act as an effective withdrawal of the prior oral consent." *United States v. Lattimore*, 87 F.3d 647, 651 (4th Cir.1996); *see also United States v. Castillo*, 866 F.2d 1071, 1082 (9th Cir.1988).

more than superficial when the agents explained that they did not have the skills nor the time to perform the examination at his home. Moreover, a graduate student in computer science would clearly understand the technological resources of the FBI and its ability to thoroughly examine his computer. Based on this knowledge, Al–Marri could have provided specific instructions to the FBI about the scope of the search he had permitted, specifically whether there were any files or programs he wanted kept private. He did not offer such guidance. Viewed objectively from the perspective of the agents, it was reasonable for Zambeck and Brown to have understood that this unrestricted grant of access, combined with Al–Marri's expertise in computer technology and his helpful attitude in handing the laptop over, indicated that Al–Marri had no qualms about an extensive search of his computer.

Al–Marri's exchange with Brown at the end of the interview on December 11 also provides insight into Al–Marri's state of mind, and what Brown reasonably could have inferred from Al–Marri's expressions regarding the scope of his consent to search the computer. Viewed objectively, Al–Marri's question "Do I get my computer back tonight?" reasonably indicated that Al–Marri did not know the length of time the FBI would retain the computer, implicitly conveyed Al–Marri's awareness and acceptance of the possibility that the agents' control over it would last beyond "tonight" and extend into an indefinite duration, and suggested that he was not insistent on demanding its immediate return. When he did not respond to Brown's answer "No, not tonight," Al–Marri further demonstrated that he felt no need to put a time limit on the FBI's possession of his laptop. If Al–Marri had any need for use of the computer, or felt any reservation or objection about the FBI's prolonged retention of it, a reasonable person would have expected Al–Marri to ask for the computer

to be restored to him within a specified time frame for whatever reason justified a prompt return. Al–Marri's silence on this subject and his failure to raise the issue again the next day persuades this Court that his consent could reasonably have been understood to be open-ended and given without a limitation on time or scope.

Even assuming Al–Marri had not voluntarily handed over his computer to the FBI agents, the Supreme Court has ruled that "a lawful search of a fixed premises generally extends to the entire area where the object of the search could be found...." *United States v. Ross*, 456 U.S. 798, 820, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982). In this case, the object of the search was not made explicit. However, the circumstance that neither Al–Marri nor the agents knew precisely what the object of the search was does not change the nature of the consent. *See United States v. Snow*, 44 F.3d 133, 135 (2d Cir. 1995) ("That the defendant did not—and probably could not—know what the officer was looking for does not change our view of his consent.").

Here, although the purpose of the FBI's search of Al–Marri's home was not specifically stated, it is clear from the totality of the circumstances that the agents' questioning of Al–Marri related to the investigation of the terrorist attacks of September 11, 2001. Al–Marri, who arrived from Qatar the day before the attacks, had already been interviewed by the same agents on October 2, 2001, exactly three weeks after the attacks. Any reasonable person in Al–Marri's position could not have lived through the events of September 11 and its aftermath and yet not realize that the FBI's questions of him so soon after—including questions about telephone calls he placed to particular individuals or numbers—related to that investigation, even if such an investigative focus was not

expressly conveyed to him. Consequently, it seems reasonably probable that federal agents involved in an investigation of international terrorist crimes who ask for permission to search a person's home under these circumstances will be understood to be looking for evidence of unlawful conduct. *See id.* ("It is self-evident that a police officer seeking general permission to search a vehicle is looking for evidence of illegal activity."). Thus, a reasonable person—and in particular a graduate student in computer science who is fluent in English—would have recognized the agents' request to search his home, car and computer as a search for evidence of possible criminal activities.

It is also clear that relevant evidence might be hidden in drawers or closed containers. *See id.* Courts have uniformly agreed that computers should be treated as if they were closed containers. *See United States v. Runyan,* 275 F.3d 449, 458 (5th Cir.2001) (assuming that computer disks are containers and subject to standards governing closed container searches); *United States v. Barth,* 26 F.Supp.2d 929, 936 (W.D.Tex.1998) (finding that Fourth Amendment protection of closed computer files and hard drives is similar to protection afforded closed con-

tainers and closed personal effects).[2] With regard to closed containers, the general rule holds that separate consent to search such an item found within a fixed premises is unnecessary. *See Jimeno,* 500 U.S. at 252, 111 S.Ct. 1801; *United States v. Zapata,* 18 F.3d 971, 973–74, 977–78 (1st Cir. 1994) (holding that consensual search of a car extended to duffel bags even where the object of search was unannounced); *United States v. $83,900.00 in United States Currency,* 774 F.Supp. 1305, 1315 (D.Kan. 1991) ("Separate consent to search containers found within the automobile need not be obtained."). Thus, in the instant case the agents were permitted under the Constitution to search Al–Marri's home and further examine his computer found within that home.[3] Accordingly, Al–Marri's motion to suppress evidence obtained from the search of his computer is denied.

### C. *MOTION TO COMPEL DISCOVERY*

#### 1. *Request for Early Production of F.R.E. 404(b) Disclosures*

Al–Marri requests a four-week notice period for material the Government contemplates introducing under Federal Rules of Evidence 404(b). The Government anticipates providing Al–Marri with two-

---

**2.** Despite the use of the term "closed," courts have compared a computer to a storage cabinet containing physical records rather than a sealed container requiring force to open. *See United States v. Hunter,* 13 F.Supp.2d 574, 584 (D.Vt.1998). This distinction is important because courts have suggested that sealed containers which must be damaged or broken to open might not fall under the scope of a general consent. *See United States v. Osage,* 235 F.3d 518, 520 (10th Cir.2000) ("[W]e have hinted that a search could be so 'invasive or destructive' as to go beyond the scope of the search consented to."); *Snow,* 44 F.3d at 135 (allowing search of duffel bags within car in part because "no damage to the bags was required to gain access."). Since a computer can be examined and its contents copied with no damage to the computer, this

Court finds that a search of a computer is not akin to a search of a sealed container. The Court's analysis proceeds accordingly.

**3.** While seizing the computer for examination at the FBI office may have inconvenienced Al–Marri, the Court acknowledges that current technology does not permit proper on-site examination of computer files. Thus, until such technology does become available, a complete seizure of the computer will be necessary, provided that proper safeguards are put in place to prevent problems such as evidence tampering. *See Hunter,* 13 F.Supp.2d at 583 ("[U]ntil technology and law enforcement expertise render on-site computer records searching both possible and practical, wholesale seizures, if adequately safeguarded, must occur.").

weeks notice prior to commencement of trial of the general nature of the other crimes evidence, if any, that the Government will seek to introduce. (Government's Memorandum of Law in Opposition to Defendant's Pretrial Motions, dated July 11, 2002 ("Gov't Memo") at 7.)

Rule 404(b) obligates the Government to provide "reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial." Fed.R.Evid. 404(b). "Reasonable notice" is not defined by the statute; courts in this Circuit have held two to three weeks notice sufficient, but a longer period may be appropriate depending on the circumstances. *See United States v. Nachamie*, 91 F.Supp.2d 565, 577 (S.D.N.Y.2000) ("[A] longer notice period is appropriate [where there is an] absence of any threat to the safety of prospective witnesses and the ... Rule 404(b) evidence [is important to] this action.") (quoting *United States v. Livoti*, 8 F.Supp.2d 246, 250 (S.D.N.Y.1998)).

In the instant case, Al–Marri has not identified circumstances warranting early production of Rule 404(b) materials. Obviously, every criminal defendant would find early production of Rule 404(b) materials to be of great assistance in preparing for trial. However, the test concerns whether the evidence has particular importance in the action and whether there is any threat to the safety of prospective witnesses. While there is no contention thus far that any witness will be placed in jeopardy, Al–Marri has not provided sufficient grounds to justify why an earlier production date is necessary. Therefore, the rules do not require production of Rule 404(b) materials any earlier than the two week period proposed by the Government.

### 2. *Giglio and Brady Material*

█ With respect to Al–Marri's motion for pre-trial disclosure of impeachment material pursuant to *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) and exculpatory material pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), the Government has assured that it intends to make any exculpatory materials available on a timely basis, and will produce all impeachment materials either at the same time as the disclosure of Jencks Act/Rule 3500 material or sufficiently in advance of each Government witness' testimony. (Gov't Memo. at 9–10.) Other courts in this circuit have found such Government testimonials to be sufficient to deny pretrial requests for discovery. *See United States v. Rueb*, 2001 WL 96177, at *6 (S.D.N.Y. February 5, 2001) ("Courts in this circuit have repeatedly denied pretrial requests for discovery orders pursuant to Brady where the government has made a good-faith representation to the Court and defense counsel that it recognizes and will comply with its disclosure obligations under Brady."); *United States v. Perez*, 940 F.Supp. 540, 553 (S.D.N.Y.1996); *United States v. Schwimmer*, 649 F.Supp. 544, 549 (E.D.N.Y.1986). Consequently, this Court sees no basis for an order directing disclosure of such material at this time. The Court also accepts the Government's acknowledgment and reaffirmation of its continuing obligation under *Brady* to provide timely disclosure in the event that exculpatory information comes to light.

For these reasons, Al–Marri's motion to compel the pre-trial disclosure of *Giglio* and *Brady* material is denied.

### D. *MOTION TO SUPPRESS STATEMENTS*

█ Al–Marri asserts that he was not read his *Miranda* rights before the two

interviews he had with the agents prior to his arrest, and therefore that all such statements should be suppressed because they were obtained in violation of his constitutional right to remain silent.

In *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Supreme Court enumerated a set of warnings required to be given to suspects prior to the commencement of custodial interrogation. The Court defined "custodial interrogation" to mean situations in which a person being questioned "has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* at 444, 86 S.Ct. 1602. In order to assess the custodial quality of an interrogation for *Miranda* purposes, the Court "must consider 'the circumstances surrounding the interrogation; and ... given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave.'" *United States v. Romaszko,* 253 F.3d 757, 760 (2d Cir.2001) (quoting *Thompson v. Keohane,* 516 U.S. 99, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995)).

With these considerations in mind, the Court finds no evidence here that the FBI's interviews of Al–Marri were conducted in a hostile or custodial atmosphere, and further finds that the agents did not create the impression that Al–Marri was unable to terminate the interview at will and leave. It is undisputed that Al–Marri's first discussion with Zambeck and Brown on October 2, 2001 was friendly and non-confrontational. Indeed, Al–Marri's rapport with the agents was strong enough that he contacted Zambeck the next day to provide further information. (Tr. at 27–28.) Consequently, it is logical to assume that when the agents returned to speak to Al–Marri two months later, without any other contact having occurred in the interim, there was no reason for Al–Marri to feel threatened by their appearance at his doorstep.

The agents testified that the second conversation at Al–Marri's home was also friendly, and that they asked Al–Marri to accompany them to the FBI office in order to further clarify his answers to some of the questions they asked him in October. (Tr. at 33–34.) As opposed to being rushed to the FBI office, Al–Marri was allowed first to change his clothes and pray. (Tr. at 44.) At no time was Al–Marri handcuffed. The agents never drew their weapons, and Al–Marri rode in the front seat with one of the agents. (Tr. at 12, 46.) The interview room at the FBI office did not lock from the inside, allowing Al–Marri to leave at any time during the interview. (Tr. at 47–48.)

These details do not indicate that Al–Marri was being forcibly held or restrained in his freedom of movement. While the interview eventually became more contentious at one point later in the evening, (Tr. at 103–04), the fact that Al–Marri voluntarily went back to the FBI office the next morning demonstrates that Al–Marri was not being held in a situation against his will. These facts persuade this Court that a reasonable person would not have understood either of the two interviews of Al–Marri to be a "custodial" experience, and thus, any statements provided prior to Al–Marri being arrested and read his *Miranda* rights should not be suppressed.

### E. *MOTION TO DISMISS INDICTMENT*

█ Al–Marri argues that his indictment should be dismissed in its entirety because his detention as a material witness was illegal, and that it was during this illegal detention that the Government built its case against him. Without addressing the still-debated question of the function of

**544**

the material witness statute, (*compare United States v. Awadallah*, 202 F.Supp.2d 55 (S.D.N.Y.2002) *with In re the Application of the United States for a Material Witness Warrant*, 213 F.Supp.2d 287, 2002 WL 1592739 (2002)), this Court finds that the question of whether or not Al–Marri's detention under the material witness statute was legal is irrelevant to the matter at hand. The pertinent evidence that forms the crux of the Government's case was seized from Al–Marri before his arrest on December 12, and thus this evidence cannot be considered the fruit of unlawful police conduct. *See Segura v. United States*, 468 U.S. 796, 815, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984) ("[O]ur cases make clear that evidence will not be excluded as 'fruit' unless the illegality is at least the 'but for' cause of the discovery of the evidence.") Moreover, Al–Marri is no longer being held as a material witness— he has been charged with a federal crime for which the Government has put forth sufficient evidence to secure an indictment. Thus, Al–Marri's motion to dismiss the indictment is denied.

### IV. ORDER

For the reasons set forth above, it is hereby **ORDERED** that Al–Marri's pretrial motion to: (i) suppress evidence pursuant to F.R.C.P. 12(b)(3); (ii) compel additional discovery pursuant to F.R.C.P. 12(b)(4); and (iii) dismiss the indictment in its entirety, is DENIED.

**SO ORDERED.**