## COMMONWEALTH *vs.* MICHAEL McDERMOTT.

Middlesex. December 7, 2006. - April 13, 2007.

Present: MARSHALL, C.J., GREANEY, IRELAND, & SPINA, JJ.

*Practice, Criminal,* Motion to suppress, Instructions to jury, Capital case, Warrant. *Search and Seizure,* Warrant, Exigent circumstances, Probable cause, Reasonable suspicion, Affidavit, Computer, Plain view. *Probable Cause. Constitutional Law,* Search and seizure, Probable cause. *Homicide. Intoxication.*

A Superior Court judge properly denied the criminal defendant's motion to suppress evidence seized from his apartment, although where the initial warrantless entry by police officers into the defendant's apartment was justified under the exigency exception to the warrant requirement, the judge incorrectly excised that portion of the warrant application describing the officers' observations during the initial entry [762-767]; nevertheless, the judge correctly determined that the affidavit accompanying the application for the original warrant set forth facts establishing a nexus between the crime and the defendant's apartment sufficient to provide probable cause [767-769], was not lacking in particularity with respect to the category of documents sought [769-770], and authorized the seizure of computers and disks within which documents listed in the warrant may have been stored [770-772]; likewise, a second warrant authorizing a search of the seized computers and disks was not overbroad [772-775], and the search of the computers and disks was not performed in an unreasonable manner [775-777].

A Superior Court judge did not abuse his discretion in denying a criminal defendant's motion for a mistrial based on a witness's single, isolated reference to the attack on September 11, 2001, when explaining the term "paranoia," where the jury could not have been unduly influenced by the remark, in light of the length of trial, the amount of evidence introduced against the defendant, and the lack of a direct connection between the defendant and the attack on September 11. [777-778]

At a murder trial, the judge did not violate the defendant's constitutional rights or otherwise err in declining to instruct the jury that they had to reach a unanimous verdict with respect to any factor relied upon to support a conviction of murder in the first degree under the theory of extreme atrocity or cruelty [778-779]; likewise, the judge did not err in failing to instruct the jury regarding involuntary intoxication, where the evidence did not warrant such an instruction [779].

INDICTMENTS found and returned in the Superior Court Department on February 15, 2001.

Pretrial motions to suppress evidence were heard by *R. Malcolm Graham*, J., and the cases were tried before him.

*Donald A. Harwood* for the defendant.

*Loretta M. Lillios*, Assistant District Attorney (*Thomas F. O'Reilly*, Assistant District Attorney, with her) for the Commonwealth.

GREANEY, J. Based on a shooting rampage that occurred in the late morning of December 26, 2000, at a Wakefield company, Edgewater Technology, Inc. (Edgewater), a jury found the defendant guilty on seven indictments charging murder in the first degree by reason of deliberate premeditation and extreme atrocity or cruelty.[1] Represented by new counsel on appeal, the defendant argues error in (1) the denial of his motion to suppress evidence seized from his apartment; (2) the denial of his motion for a mistrial; and (3) the instructions to the jury. The defendant also requests that, pursuant to our power under G. L. c. 278, § 33E, we vacate the murder convictions and grant him a new trial. We affirm all of the convictions and discern no basis to grant relief under G. L. c. 278, § 33E.

1. *Facts.* Based on the Commonwealth's evidence, the jury could have found the following facts. The defendant began working at Edgewater in February, 2000. On December 14, 2000, he had a conversation with Cheryl Troy, who was in charge of the human resources department of Edgewater, and Patricia Bohrer, the company's chief financial officer, concerning an Internal Revenue Service (IRS) tax lien of approximately $5,500 that required Edgewater to garnish a large portion of the defendant's paycheck until the lien was fully paid.[2] The defendant claimed that he did not owe the IRS any money. He was upset and angry, and indicated that he did not understand why Edgewater had to comply with the garnishment. Later that afternoon, Marc Damboorajian, the program manager in charge of the application support team that included the defendant,

---

[1] The jury also found the defendant guilty on five indictments charging illegal possession of a large-capacity weapon, illegal possession of a large-capacity feeding device, illegal possession of a semiautomatic pistol, illegal possession of a rifle, and illegal possession of a shotgun.

[2] The garnishment would have left the defendant with $276.92 every two-week pay period, and would have lasted about six weeks, or three payrolls.

spoke with the defendant in an effort to help resolve the tax lien. On December 18, Damboorajian assisted the defendant in a telephone conference with the IRS that terminated when Damboorajian realized that nothing was going to be resolved. The defendant was not willing to establish a payment plan, and insisted that he was not going to make any payments to the IRS.

The defendant had other financial trouble. He was behind on his automobile payments, and on December 21, the defendant received a telephone call informing him that his automobile would be repossessed if he did not make his payments. The defendant began to park on the street, approximately five minutes away from Edgewater, instead of in the parking garage across the street from Edgewater where employees received parking privileges (Edgewater garage).

On Friday, December 22, the defendant asked three of his coworkers to come to his cubicle to witness the signing of his will. He "walked [them] through" the instructions, and they witnessed his signature to the document and then signed it themselves. On Sunday, December 24, the defendant test-fired a shotgun off the side of Crystal Street in a secluded area of Haverhill, which was about a five-minute drive from the defendant's residence. On Monday, December 25, the defendant entered Edgewater at 6:57 P.M., and left about eighteen minutes later.

On Tuesday, December 26, the defendant entered Edgewater at 10:29 A.M., carrying a large, black duffel bag. He had parked his automobile in the Edgewater garage. Shortly after 10:30 A.M., the defendant went to the kitchen and had a brief and friendly conversation with a senior consultant at Edgewater. The defendant also engaged in conversation with another coworker about living in Haverhill. The defendant was jovial and cordial, but abruptly ended the conversation when the coworker spotted the large, black duffel bag on the defendant's desk. At approximately 11:07 A.M., the defendant received a telephone call about his automobile. He stated that he no longer needed the automobile and it could be picked up at the Edgewater garage.

After completing the telephone call, the defendant entered the reception area, carrying the duffel bag. Janice Hagerty, a travel coordinator of Edgewater who was with Troy in the reception

area, asked the defendant where he was going, and he responded, "Actually, I need to see someone in human resources." The defendant aimed his assault rifle and fired twice, and then ten more times in rapid succession, killing both Hagerty and Troy. The defendant stated softly, "Ah, it's okay."

In the accounting area in the south side of the building, Linda Tessier, who worked in the accounts payable department, heard loud noises coming from the north side of the building and called Hagerty in reception. Hagerty did not answer the telephone. Rose Manfredi, a payroll manager who had been processing the payroll that day,[3] was standing with Paul Marceau, a project leader, by a file cabinet in the accounting area. Manfredi asked Tessier to shut and lock the door, which Tessier did. Tessier told everyone to get under their desks. Marceau got under a desk in a coworker's cubicle. Tessier hid under her desk, moving her chair with her jacket draped over it into the desk.

Meanwhile, Jonathan Land, the vice-president of consulting services, was standing with Louis Javelle, the director of consulting services and the defendant's direct supervisor, in a hallway in the mezzanine area of the south side of the building, facing the reception area. The defendant walked toward them, carrying an assault rifle in one hand and something else in his other hand. When the defendant was approximately fifteen to twenty feet away from Land and Javelle, Javelle said, "Oh shit." Land went back to his office and heard Javelle ask, "Mike, why?," followed by a loud pop. The defendant shot Javelle four times, killing him. Land then heard Craig Wood, a technical recruiter who had been sitting in his cubicle in the mezzanine area, say, "Mike, no." The defendant shot Wood in two series of blasts, killing him. Between the series of blasts, Wood said, "Ow," and then, "Please." The defendant proceeded to kill Jennifer Capobianco, a software programmer who had been seated at her cubicle in the mezzanine area, shooting her four times in the back.

The defendant fired a shot through the lock on the door to the accounting area and entered. From under her desk, Tessier

---

[3]Manfredi was responsible for the biweekly payroll. She processed the payroll on the Tuesdays preceding the Friday payroll dates. The forthcoming payroll date of Friday, December 29, 2000, would have been the first one in which the defendant's salary would have been garnished.

could see a weapon and legs walking by. She peeked out and saw the defendant, who was holding a rifle in his right hand. The defendant stopped between the cubicles that Marceau and Manfredi were under and raised his left arm toward Marceau. Tessier closed her eyes and heard two shots. After a third shot, Manfredi yelled, "Ow." The defendant shot Manfredi multiple times. Manfredi screamed, and the defendant shot her again. Tessier heard gurgling sounds coming from the direction of Manfredi's cubicle. Manfredi died within minutes. The defendant shot Marceau in the head, abdomen, and chest, killing him.

At approximately 11:15 A.M., officers from the Wakefield police department were dispatched to Edgewater in response to several 911 telephone calls about shots being fired. Officers entered the building and found the defendant sitting in a chair in the reception area, erect and motionless, with both arms on the arm rests. The defendant's duffel bag was on a couch, and there was an AK-47 semiautomatic assault rifle on the floor by the defendant's right foot and a twelve-gauge Winchester 1300 pump-action shotgun by his left foot. These weapons were out of ammunition. The officers told the defendant to put his hands up and to get on the ground. The defendant did not respond. An officer directed the defendant to put his hands on his head, and the defendant replied, "I don't speak German." Two officers then pulled the defendant to the ground and handcuffed him. The officers searched the defendant and found a loaded .32 caliber Spanish Retolaza semiautomatic pistol in his front right pocket. The defendant's duffel bag contained several fully loaded magazines, loose ammunition, shotgun shells, and some cartridge boxes.

The defendant followed the officers' instructions to roll over and stand up, to sit back down in the chair and lift up his legs so that his boots could be removed and searched, and to get into a police cruiser in a certain manner to avoid injury due to his large size. The officers transported the defendant to the police station where he was booked.

Seven people were pronounced dead at Edgewater and were identified as Troy, Hagerty, Wood, Capobianco, Javelle, Marceau, and Manfredi. Each person's cause of death, with the exception

of Hagerty, was multiple gunshot wounds. Hagerty died almost instantly from a single gunshot wound to her head, but had also been shot in the back. All of the victims had been alive when they were repeatedly shot.

Police recovered numerous discharged cartridge casings, numerous spent projectiles, several discharged twelve gauge shotgun shells, and numerous spent lead and copper projectile fragments from the reception, mezzanine, and accounting areas of Edgewater. In addition to the weapons recovered by the defendant's feet and the one found on his person, police recovered a .460 magnum caliber Weatherby Mark V bolt-action rifle from the defendant's work station. The Commonwealth's expert ballistician explained that testing revealed that numerous spent projectiles recovered from Edgewater had been fired from the defendant's AK-47 assault rifle, and that the discharged shotgun shells recovered from Edgewater and from Crystal Street had been fired from the defendant's twelve-gauge pump-action shotgun.

We now summarize the defense case and the Commonwealth's rebuttal evidence. The defendant presented evidence supporting a defense that he was not criminally responsible under the standards set forth in *Commonwealth* v. *McHoul*, 352 Mass. 544, 546-547 (1967). The defendant testified. He was born Michael Morgan Martinez, but later changed his surname to McDermott in 1980. His parents were strict Catholics. The defendant reported having been repeatedly raped by a neighbor as a young boy. He grew up as a "geek." Although gifted with high intelligence, the defendant received poor grades in high school and got into some trouble when he broke into a neighbor's house. He first attempted suicide as a teenager by taking numerous "Sleep Eze" pills. His parents sent him to a psychologist, who violated his trust by failing to maintain his confidences.

After graduating high school, the defendant joined the Navy where he served for six years, working principally on a nuclear submarine. He was honorably discharged in June, 1982.

In 1982, the defendant obtained employment at Maine Yankee, a nuclear power plant in Maine. He received a promotion in 1985. In February, 1987, the defendant attempted suicide by cut-

ting his wrist.[4] He was admitted to Pembroke Hospital. He later filed a worker's compensation claim against Maine Yankee because he was not permitted to return to work. The defendant netted approximately $85,000 in a settlement of that claim.

The defendant returned to Massachusetts and, in September, 1989, began taking classes at Northeastern University. In May, 1989, he was admitted to a Boston hospital for a few days because he was suicidal.

In July, 1990, the defendant started working for Duracell Battery, and was employed there for a decade. In the early 1990's, the defendant attempted suicide by overdosing on Xanax. He was admitted to Pembroke Hospital for seven weeks. Sometime thereafter, he got married. His wife left him in May, 1996, and they were divorced in August, 1997. Instead of relocating with Duracell Battery to Connecticut, the defendant obtained employment at Edgewater as an associate software developer in February, 2000. In the fall of 2000, the defendant moved to Haverhill.

Commencing in his youth, and continuing into adulthood, the defendant described a long-standing problem with depression. Over the years, the defendant experienced a variety of problems, including visual distortions, extreme claustrophobia, transgression into a "fugue state,"[5] a difficulty focusing on objects, muffled hearing and ringing in his ears, hearing voices from electronic devices, and auditory and visual hallucinations. He kept most of these problems to himself because of his mistrust of psychiatrists and his fear of being locked up. The defendant claimed that, during his employ at Maine Yankee, he was subject to radiation exposure that "killed" his thyroid. Throughout his life, the defendant took a variety of medications, including medication for a hypoactive thyroid, medication for high blood pressure, and, since moving to Haverhill, different antidepressants, such as Prozac and Trazodone. The defendant admitted that, since the 1980's, he had been lying to doctors to obtain prescription medications.

---

[4]A hospital record indicates that the "precipitant" for the defendant's suicide attempt "was his feeling of helplessness in as much as he felt he was doing everything correctly [but] the world was not treating him fairly." Much of the defendant's stress was work related.

[5]A fugue state is a disassociative episode. When a person comes out of the state, he or she has no memory of what occurred in the state.

The defendant recounted that, for as long as he had access to the Internet, going back to 1985, he "wanted to understand what type of insanity [he] had" and conducted research on the computer. His research included Internet searches on how to fake mental illness, psychosis, and malingering, and he fully understood the data he retrieved on these subjects. In December, 1999, the defendant purchased a book edited by Richard Rogers entitled Clinical Assessment of Malingering and Deception, which he claimed not to understand, and he later obtained an article over the Internet on the psychometric detection of malingering. The defendant also downloaded an article entitled "Borderline Personality Disorders, Symptoms and Etiology," which he explained was an attempt at self-diagnosis. He studied and researched the Minnesota Multiphasic Personality Inventory (MMPI) test.

The defendant testified that on December 14, 2000, after he learned about the IRS garnishment of his salary, an archangel appeared to him in his cubicle at work. The archangel said that God had a plan for him. Under the plan, the defendant could obtain a soul[6] and go to purgatory (and possibly, in time, to heaven) if he went back in time and prevented the Holocaust by killing Hitler and six of the "architects of the Holocaust," who were Nazis wearing swastikas. The archangel indicated that the defendant would act after the appearance of three signs.[7] The defendant then started preparing for his completion of God's plan.

The defendant reasoned he could not "leave" himself to the Nazis after killing Hitler and the six Nazis.[8] However, because suicide constitutes a sin that condemns one to hell, the defendant concocted a scheme where he would die without sin. The defendant planned to take poison before the killings, and then

---

[6]The defendant believed he was born without a soul.

[7]The defendant explained that the first sign was the appearance of the archangel, the second sign was a celestial sign (that turned out to be a partial solar eclipse that occurred on Christmas), and the third sign was the occurrence of Boxing Day. On December 26, 2000, at about 10:37 A.M., the defendant's mother called him at work and wished him a happy Saint Stephen's Day, adding, "or would you rather Boxing Day."

[8]The defendant felt that Troy and Bohrer were "no better than Nazis" because they just chose to follow orders.

succumb to death afterward. This plan would ensure the defendant a place in purgatory.

The defendant decided what weapons he would use and, on December 24, test-fired his AK-47 assault rifle and his shotgun.[9] On December 25, the defendant spent Christmas with his family. That night, he went to Edgewater and dropped off some of the firearms and ammunition he planned to use. The defendant did not want to walk in the next day and "scare everyone off and cause a panic by carrying in firearms."

On December 26, the defendant went to work. He loaded a large black duffel bag with ammunition and a .32 caliber automatic handgun, and put the bag in his office cabinet. He took some Percocets and Darvocets, together with some vodka. He spoke to several employees. Over the telephone, he also spoke to a person about the payments on his automobile, and to his mother.

The defendant, armed, then walked to the reception area and announced that he was "looking for HR," which was the "triggering phrase" that would transport him back in time. A portal opened in front of him and he was transported to a bunker in Berlin in the year 1940 with his AK-47 assault rifle and his shotgun. There were two men wearing swastika arm bands, whom he shot with the AK-47, and then he shot three men with armbands who were on a raised platform. The defendant testified that he could then "feel Hitler's thoughts emanating" from a room, so he blew the lock out of the door to the room, went inside, shot and killed "the last Nazi" who was hiding there, and then shot and killed Hitler. The defendant had completed God's plan; he returned to the reception area and sat down. He was later dragged off by guards to a police station in Berlin, where he died. The defendant testified that he currently is in purgatory and that nothing around him exists.

Two mental health professionals, Dr. Ann Schwab, a psychologist, and Dr. Alan D. Rothstein, a psychiatrist, both of whom had treated the defendant prior to December 26, 2000, testified for the defense. Schwab first met with the defendant in Maine in June, 1987, and last saw the defendant in April, 1988.

---

[9]The defendant admitted that he did not have a license to carry his firearms, and that he had stockpiled them more than a decade before the shootings.

She diagnosed the defendant as having a depressive mood disorder and an obsessive-compulsive personality disorder. The defendant disclosed the sexual abuse that he suffered as a child. He reported feelings of loneliness, troubles at work, having heard noises from a television when the sound was off, and sensitivity to high frequency noises. The defendant remarked that "you learn not to talk about [the noises] because people think you are crazy."

In 1996, the defendant started seeing Dr. Rothstein, who diagnosed him as having recurrent major depression, a mixed character disorder, and an obsessive-compulsive personality. This diagnosis remained the same through December, 2000. In 1999 and 2000, Dr. Rothstein prescribed the defendant Prozac and Trazodone. At a therapy session on March 7, 2000, the defendant reported that he had started working at Edgewater and that it was a "terrific place." The defendant acknowledged that he was still having problems with overeating and not eating healthy foods, and with credit cards. He also told Dr. Rothstein that he possessed guns.[10] During a session in September, 2000, the defendant stated that he had been depressed the past two months, had stopped going to the gym, and was upset because the IRS claimed he owed it money.

On November 7, 2000, the defendant reported that his condition had improved. On December 14, the defendant telephoned Dr. Rothstein and told him that the IRS was going to garnish his wages and leave him too little money to live on. The defendant was upset. Dr. Rothstein suggested that the defendant come in prior to their next scheduled appointment of December 26. The defendant reported back on December 18 that his supervisor was trying to talk to the IRS on his behalf. Dr. Rothstein again offered the defendant a sooner appointment, and the defendant said he would contact him if necessary. Dr. Rothstein never heard from the defendant again.

Following his arrest, the defendant was evaluated by psycholo-

---

[10]Dr. Rothstein told the defendant that, in light of his depression and suicidal feelings, he should not possess weapons. The defendant replied that he had a legal right to have weapons and that "if anyone tells me I have to get rid of them, I'll just stop having contact with that person."

gist Ronald S. Ebert[11] and psychiatrist Anthony Joseph. Based on his review of records and interviews with the defendant, Dr. Ebert concluded that the defendant suffered from schizophrenia of the paranoid type. Based on his review of records and interviews with the defendant and others, Dr. Joseph concluded that the defendant suffered from a schizoaffective disorder of the depressed subtype. Both Dr. Ebert and Dr. Joseph expressed the opinion that, at the time of the killings, the defendant was suffering from a mental disease that deprived him of the substantial capacity to appreciate the wrongfulness or the criminality of his conduct and interfered with his ability to conform his conduct to the requirements of the law. Neither believed that the defendant was malingering.

In rebuttal, the Commonwealth questioned Mohammad Hassar, a software developer at Edgewater who had worked with the defendant. While at work on December 22, 2000, Hassar explained to the defendant that he was fasting for the religious holiday Ramadan. The defendant told Hassar that he did not believe in God, but rather believed in science.

The Commonwealth also presented two expert witnesses, psychiatrists Dr. Michael Annunziata and Dr. Malcolm P. Rogers, both of whom testified that, based on their respective reviews of various records and interviews with the defendant and others, the defendant was criminally responsible when he committed the killings and was feigning mental illness. In reaching his opinion, Dr. Annunziata considered the defendant's

[11]Psychologist Ronald S. Ebert had another psychologist, Anthony Kalinowski, administer the Minnesota Multiphasic Personality Inventory (MMPI) test to the defendant in November, 2001. The test results indicated that the defendant is a schizotypal person, namely a person who is socially disconnected and who has odd and unusual thoughts and perceptual experiences. Dr. Kalinowski testified that people with this disorder are prone to becoming psychotic with some regularity. Test results also revealed that the defendant is inflexible, rigid, righteous, resentful, chronically angry, depressed, unpredictable, and "the kind of person who would walk along with his anger under pretty good control and then explode." Dr. Kalinowski compared the 2001 test results to the test results of a MMPI test taken by the defendant in 1982. While there were variances in the results, the defendant's profile essentially remained the same. Noteworthy, however, was a "jump" in one "scale" that indicated that the defendant either was malingering or had become more sick. Dr. Kalinowski rejected the prospect of malingering, but acknowledged there certainly was a risk of it.

ingestion of pills as a teenager, his self-inflicted superficial scratches on his wrist after he was fired from Maine Yankee, and his "insignificant overdose" of pills in 1990 that did not require hospitalization and that occurred after he ran out of tuition money. Dr. Annunziata testified that the circumstances of these acts showed they were mere gestures and not real suicide attempts. Dr. Annunziata acknowledged that the defendant has not had "a happy life in many respects" and has a depressive disorder and a personality disorder, but explained that these disorders did not amount to a mental disease or defect.

Dr. Annunziata stated that there were no indicators that the defendant had a schizophrenic disorder. He explained that schizophrenia is a longitudinal disorder, not a disorder that abruptly appears. He also explained that delusions, especially of the elaborate and dramatic type such as the defendant claimed occurred to him on December 14, 2000, do not appear abruptly in a person like the defendant, who has no prior history of psychosis. The defendant exhibited no dysfunction in the weeks, days, hours, or minutes before the shootings. His work performance at Edgewater remained strong. On the morning of December 26, the defendant was able to carry on in the usual course, speaking with his coworkers, the representative who indicated his automobile would be repossessed, and his mother. The archangel's prediction of an eclipse, part of the defendant's delusion, was an entirely predictable event that did, in fact, occur on Christmas that year. That a delusion would unfold into reality was coincidental to the extreme. Further, the defendant's December 22 statement to Hassar that he (the defendant) did not believe in God was inconsistent with the defendant's purported religious delusion that took place on December 14 and his compulsion to carry out God's plan as relayed by the archangel.

Dr. Rogers also concluded that the defendant had problems with depression and a personality disorder, none of which constituted a mental disease or defect. He expressed the opinion that the defendant did not have a psychosis at the time of the shootings. Dr. Rogers indicated that the defendant appreciated the wrongfulness of his conduct based on his decision to test-fire his weapons in a secluded area and his decision to sneak

weapons into Edgewater on Christmas when his coworkers would not be present. Dr. Rogers's conclusion that the defendant possessed the substantial capacity to conform his conduct to the requirements of the law was based, in part, on the defendant's ability to function and act in his usual fashion during the time preceding the shootings, and his presence of mind when the police entered Edgewater "to hold still and not move and to keep his hands where they were visible" so that he would not be shot or hurt. Dr. Rogers believed that the defendant was faking an insanity defense because many of the defendant's reported symptoms "did not fit [his] observable behavior." Dr. Rogers based this conclusion on several factors: there was no evidence of psychosis; a delusional belief system usually evolves gradually and does not begin at a fixed moment in time; after someone develops a delusional belief system or hallucinations, there is a fluctuation in the severity of those symptoms — they do not remain static, such as maintaining, in the defendant's case, an ongoing delusion that he is in purgatory; and the defendant researched specifically how to fake mental illness and how to malinger.

2. *Motions to suppress.* a. *Standard of review.* When reviewing a motion to suppress, we accept the subsidiary findings of fact made by the motion judge and give deference to the judge's ultimate conclusions that are supported by the evidence. *Commonwealth* v. *Parker*, 402 Mass. 333, 339 (1988), *S.C.*, 412 Mass. 353 (1992), and 420 Mass. 242 (1995). "Nevertheless, where the ultimate findings and rulings bear on issues of constitutional dimension, they are open for review." *Commonwealth* v. *Haas*, 373 Mass. 545, 550 (1977), *S.C.*, 398 Mass. 806 (1986).

b. *Warrantless search of defendant's apartment and subsequent search and seizure made pursuant to warrant.* Prior to trial, the defendant moved to suppress the evidence that police officers seized from his Haverhill apartment pursuant to a search warrant. Insofar as relevant here, the defendant challenged the warrant that was the basis of the police search of his apartment on three grounds: the warrant (1) was tainted by illegally obtained police observations of his apartment during an initial warrantless entry to conduct a protective sweep, (2) was otherwise lacking in prob-

able cause, and (3) was overbroad. The defendant also asserted that the seizure of five of his computers and computer disks, in particular, was unlawful because the warrant did not specifically authorize their seizure. He advances these same arguments on appeal, under both the Federal and State Constitutions. We reject them.

The motion judge's[12] findings of fact, occasionally supplemented with undisputed evidence from the record, follow. All of the findings are supported by the evidence that the judge found credible, and we accept them. See *Commonwealth* v. *Sparks*, 433 Mass. 654, 656 (2001), and cases cited.

We first set forth those findings concerning the initial warrantless entry of the defendant's apartment.[13] State police Detective Lieutenant Gregory J. Foley arrived at Edgewater at approximately noon on December 26, 2000. He learned that seven people had been shot and killed, and that the defendant had been arrested. After searching the premises and discovering seven victims who had been repeatedly shot and a large amount of spent shell casings from two weapons, Foley became concerned that the defendant might have killed or harmed others before arriving at Edgewater. Foley's concern was based on the details of his investigation thus far, his previous experience in connection with a multiple homicide case, as well as similar cases that he had heard about involving violence at a suspect's work and home. Based on these concerns, Foley sent police officers to the defendant's apartment in Haverhill to secure the premises and to check for additional victims inside.

Captain Donald Thompson and three other officers of the Haverhill police department went to the defendant's apartment at approximately 2:35 P.M.[14] After learning from the building manager that the defendant rented the apartment and that she believed no one else was inside the apartment at the time, the officers knocked on a door to the apartment and received no

---

[12]The motion judge was also the trial judge.

[13]The Commonwealth called two witnesses to testify at the evidentiary hearing on this issue, State police Detective Lieutenant Gregory J. Foley and Captain Donald Thompson of the Haverhill police department. The defendant did not produce any witnesses.

[14]Officers originally went to the defendant's former residence in Weymouth before they learned that the defendant had moved to Haverhill.

response. Using a key provided by the building manager, the officers then entered the apartment. The officers checked each room for victims, looking in any area that could contain a victim. They found no victims, but observed ammunition and a firearms manual on the kitchen table, and a box with the word "danger" written on it. The officers were inside the apartment for approximately five minutes and did not pick up or remove any items. They then secured the apartment from the exterior.

We turn next to the findings concerning the subsequent search of the defendant's apartment made pursuant to a warrant.[15] While the defendant's apartment was being secured, State police officers obtained a warrant to search it based on an affidavit sworn to by Sergeant Thomas Sullivan of the State police. After describing his extensive education and training, and nineteen years' experience as a police officer, Sergeant Sullivan stated he believed probable cause existed that "evidence of the crime of murder" would be found in the defendant's apartment. In the affidavit, he recounted what had occurred at Edgewater that morning, and summarized the investigation that had been conducted to that point. Sergeant Sullivan included information that the defendant recently had been informed that his wages would be garnished because he was in arrears on income taxes, and that an Edgewater employee stated that the defendant had asked several coworkers to witness the execution of his will just days before the shootings. The affidavit recited that police had done a protective sweep of the defendant's apartment and while doing so saw "in plain view firearms and ammunition and boxes marked 'danger.' " The warrant that was issued authorized police to search for and seize the seven categories of items described in Sergeant Sullivan's affidavit: firearms, ammunition, bullet casings and projectiles, gunshot residue; items marked 'DANGER'; documents reflecting the possession, custody, or control of the premises; documents reflecting the purchase of, or license to carry, firearms and ammunition; documents reflecting the employment, salary, and garnishment of wages

---

[15]There was no testimony taken on this issue. Instead, the parties relied on documentary evidence, including State police Sergeant Thomas Sullivan's affidavit made in support of the search warrant, the search warrant and return, and an affidavit of State police Trooper William J. Donoghue.

of the defendant; documents reflecting the mental state and mental functioning of the defendant in the days and weeks leading up to December 26, 2000; and the defendant's will and documents related to the preparation or signing of a will.

At approximately 7:30 P.M., State troopers arrived at the defendant's residence with the search warrant and a copy of Sergeant Sullivan's affidavit. After making cursory observations in the apartment of the boxes marked "danger," the officers left and waited for the arrival of the State police fire and explosion unit. Once the apartment was deemed to be safe, the officers, at approximately 10:30 P.M., reentered to conduct the search, which concluded at 12:30 A.M. on December 27. A State trooper filed a return that listed sixty-seven items seized from the defendant's apartment. Included in the items seized were five computers, computer disks, and the defendant's will. The list of items seized stated where each item had been located as well as the name of the officer who found the item.

The judge concluded that the warrantless search of the apartment was not justified by the exigency exception to the warrant requirement. Despite this perceived defect, the judge ruled that the warrant application, with the officers' observations from the initial entry excised, stated sufficient probable cause to support the warrant with regard to a majority of the items seized.[16] Concerning the warrant's breadth and particularity, the judge ruled that the warrant provision allowing seizure of documents reflecting the defendant's mental state and functioning failed to state sufficient particularity, but that seizure of most of the items in that category could be justified under the plain view doctrine.[17] The judge upheld the seizure of the computers and disks on the ground that they were closed "containers" capable of holding documents that were the subject of the search under the warrant.

We conclude, contrary to the judge, that the initial five minute

---

[16]The judge concluded, based on the excised portion of Sergeant Sullivan's affidavit, that no probable cause existed to justify the seizure of items marked "Danger" in the defendant's apartment.

[17]The motion judge concluded that there was not sufficient probable cause to support seizure of six of the items without the observations from the initial search, and that the plain view doctrine did not justify their seizure. The judge granted the defendant's motion to suppress with respect to those items.

warrantless entry into the defendant's apartment was justified under the exigency exception to the warrant requirement and, as a consequence, that the portion of the warrant application describing the officers' observations during the initial entry should not have been excised. We agree with the judge's conclusions that the warrant was supported by probable cause and was not overbroad. We also agree with the judge's analogy to closed containers with respect to the seizure of the computers and disks, and conclude that they were not illegally seized.

(i) *Initial warrantless entry.* The officers' initial entry fell within the exigency exception to the warrant requirement.[18] "Exigencies which may justify a procedure without warrant are a narrow category and must be established by the Commonwealth which bears the burden of proof." *Commonwealth* v. *Young*, 382 Mass. 448, 456 (1981). To meet this burden, the Commonwealth must show that (1) "the authorities had reasonable ground to believe that an exigency existed," and (2) their actions were "reasonable under the circumstances." *Commonwealth* v. *Morrison*, 429 Mass. 511, 515 (1999), quoting *Commonwealth* v. *Marchione*, 384 Mass. 8, 10-11 (1981). Reasonableness must be "evaluated in relation to the scene as it could appear to the officers at the time, not as it may seem to a scholar after the event with the benefit of leisured retrospective analysis." *Commonwealth* v. *Young, supra.*

Lieutenant Foley's testimony at the evidentiary hearing, which was found credible by the judge, sufficiently demonstrated that there was reasonable ground to believe that an exigency existed. Several people — seven, and not just one or even two — had been repeatedly shot and killed by the defendant at Edgewater. The defendant had used at least two weapons, and a large amount of ammunition was found at the scene. Many of the employees had fled Edgewater during or after the shootings, and officers were dispatched to try to gather information from

---

[18]Because we hold that the initial entry was proper, we need not address the defendant's argument that the entire warrant was tainted because it was "an exploitation of the prior illegality." *Commonwealth* v. *Blake*, 413 Mass. 823, 830 (1992). The motion judge correctly concluded that there was probable cause for the issuance of the warrant even without the officers' observations during the initial entry. See *Commonwealth* v. *Hall*, 366 Mass. 790, 795-798 (1975).

them. The officers had no information whether the defendant was married, had a friend or partner, had children, or had anyone staying with him at his apartment for the Christmas holiday. Information relayed by the building manager did not definitively rule out any of those possibilities. In light of all these circumstances, as well as Lieutenant Foley's knowledge of past cases, and personal experience with a former case, in which victims of violent crimes were found both at a suspect's residence and at his place of work, reasonable grounds existed to check briefly the defendant's apartment for additional victims, who, due to the type of injury the defendant had repeatedly inflicted on his victims at Edgewater, may not have been conscious or able to seek help on their own. See *Mincey* v. *Arizona*, 437 U.S. 385, 392 (1978), quoting *Wayne* v. *United States*, 318 F.2d 205, 212 (D.C. Cir. 1963) ("The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency").

In addition, the judge's findings derived from Captain Thompson's testimony demonstrates that the actions of the officers who entered the defendant's apartment without a warrant were reasonable. The officers looked only in places where a person could be found, they did not pick up or remove any items, and they remained in the apartment for a very short time, approximately five minutes. See *Commonwealth* v. *Lewin (No. 1)*, 407 Mass. 617, 621-622 (1990) (scope of warrantless protective sweep for victims in a murder case "is limited to a cursory inspection for victims or suspects").

(ii) *Probable cause.* We reject the defendant's claims that the affidavit failed to establish probable cause for issuance of the warrant to search his apartment. We give considerable deference to a magistrate's determination of probable cause. *Commonwealth* v. *Walker*, 438 Mass. 246, 249 (2002). "An affidavit must contain enough information for an issuing magistrate to determine that the items sought are related to the criminal activity under investigation, and that they reasonably may be expected to be located in the place to be searched at the time the search warrant issues." *Commonwealth* v. *Cinelli*, 389 Mass. 197, 213, cert. denied, 464 U.S. 860 (1983). See *Commonwealth* v. *Cromer*, 365 Mass. 519, 524 (1974).

The defendant correctly points out that the commission of a crime in itself will not provide probable cause to search the suspect's home. Probable cause will exist, however, when a nexus is established between the crimes and the suspect's home. The nexus between the items sought and the place to be searched "may be based on 'the type of crime, the nature of the missing items, the extent of the suspect's opportunity for concealment, and normal inferences as to where a criminal would be likely to hide [evidence of the crime].' " *Commonwealth* v. *Wilson*, 427 Mass. 336, 342 (1998), quoting *Commonwealth* v. *Cinelli, supra.* We have previously held that, even when a murder is committed away from a defendant's residence, sufficient probable cause exists to obtain a warrant to search the residence when there is evidence that it was "reasonably likely" that the items specified in the affidavit could be found there. See *Commonwealth* v. *Wilson, supra* at 343; *Commonwealth* v. *James*, 424 Mass. 770, 778 (1997). In the *Wilson* case, we held that the magistrate properly drew a reasonable inference that ammunition and rubber surgical gloves could be found in the defendant's house, even though the murders had been committed at another location, based on information in the affidavit, including the defendant's motive to kill the victims and his statements during a standoff with the police. *Commonwealth* v. *Wilson, supra* at 342-343. In the *James* case, we held that there was probable cause stated in the warrant affidavit for police to search the defendant's residence for knives, sneakers, dark clothing, and face masks as evidence of a murder that occurred outdoors, where the affidavit contained specific facts obtained from eyewitnesses to the attacks linking the perpetrators of the crime to the items. *Commonwealth* v. *James, supra.*

Here, the information in the affidavit describing the shootings and the initial investigation (including the numerous firearms and large quantity of ammunition involved in the shootings), combined with the police observations of a firearms manual and ammunition during the warrantless search of the defendant's residence, provided a clear link between the defendant and the shooting deaths of his seven coworkers and suggested that the

defendant's will,[19] and other evidence relevant to the investigation, could be found at the defendant's residence. As noted by the judge, in light of the arsenal of firearms and ammunition recovered at Edgewater, the magistrate had a sound basis reasonably to infer that the defendant did not hastily acquire the arsenal, but more likely amassed it over time, and had brought the weapons to work from another location large enough to store them, namely, his apartment. It follows that the magistrate could also reasonably infer that documents regarding the defendant's purchase of such firearms and ammunition, as well his legal right to carry firearms, are documents of a personal nature that would likely be kept in a secure location such as the defendant's apartment. Contrary to the defendant's contention, the fact that his identity, as the perpetrator, was not in question does not mean that police lacked probable cause to collect evidence confirming his identity and other relevant materials.

The defendant specifically argues that there was no probable cause for seizure of documents reflecting the defendant's mental state and functioning because "it is difficult to conceive of how" these documents would "reveal any evidence of criminality." However, the affidavit's description of the defendant's conduct in the aftermath of the shootings — including his comments to police that he did not speak German, made both at Edgewater and during his booking — provided probable cause for the police to investigate the defendant's responsibility for the shootings. See *Commonwealth* v. *Cinelli, supra*; *Commonwealth* v. *Cromer, supra*.

(iii) *Lack of particularity.* We reject the defendant's argument that the warrant was overbroad with respect to the category of "documents reflecting the mental state and mental functioning of [the defendant] in the days and weeks leading up to December 26, 2000." Although no evidence from this category

---

[19]The fact that the defendant's will had been seen at his place of work does not mean that the magistrate could not reasonably infer that the defendant, after its execution, took the will home to keep it among his personal papers. See *Commonwealth* v. *Burt*, 393 Mass. 703, 716 (1985) (holding that it would be logical to conclude that bank books, as well as other items, would be found in the defendants' residences and vehicles). The same can be said of documents reflecting a financial motive for the shootings, such as the wage garnishment papers. See *id.*

was admitted at trial, we examine the seizure of these items[20] as a basis for the second warrant obtained by police to search the computers.

The challenged category in the warrant was not lacking in guidelines to the point that the officers were on a roving search. See *Commonwealth* v. *Taylor*, 383 Mass. 272, 275-276 (1981) (invalidating warrant that authorized seizure of unspecified "antique jewelry" in jewelry store). The category was limited both in time frame and in the nature of the items that could be seized with respect to a defendant who, given his demeanor on arrest, was obviously either mentally disturbed or pretending to be so. In addition, the scope that this particular search authorized was not, as the defendant argues, impermissibly broadened beyond a foundation of probable cause. As discussed above, the affidavit accompanying the warrant provided probable cause to search for evidence pertaining to the defendant's participation in, and responsibility for, the shootings, and the mental state and functioning category was tailored to allow investigators to search for evidence that fell within that subject. Although police knew, based on the information they had when they acquired the warrant, that the mental state and functioning of the defendant prior to, and during, the shootings would be an important part of the investigation, they did not have information that would allow them further to limit the description of this category of items. See *Commonwealth* v. *Freiberg*, 405 Mass. 282, 299, cert. denied, 493 U.S. 940 (1989).

(iv) *Suppression of the computers and disks.* We reject the defendant's argument that the seizure of the computers and disks from his apartment was unlawful on the ground that the warrant did not specifically authorize the seizure of any "computer" or "disk."[21] We join those courts adopting the approach that a warrant that authorizes a search for records (properly delineated in a

---

[20]The items seized were pharmacist notes found with an electric bill; seven prescription bottles; eight pharmacist notes; the defendant's day planner; pharmacist notes located in a "Hoppes" box; and twenty-seven books and one pamphlet regarding explosives, weapons, crime classification, lie detection, and other subjects that police could reasonably have inferred the defendant used in his planning and preparation for the shootings. Some of the prescription bottles included bottles for antidepressants, including Prozac and Trazodone.

[21]The Commonwealth does not argue that the defendant does not have a

warrant) permits the seizure of computers and disks that electronically may hide and store such records. See *United States* v. *Musson*, 650 F. Supp. 525, 531-532 (D. Colo. 1986) (warrant authorizing seizure of "any records or writings of whatsoever nature showing any business or financial transactions" permitted seizure of computer disks); *People* v. *Gall*, 30 P.3d 145, 148 n.4, 153 (Colo. 2001) (warrant authorizing seizure of "written or printed material" indicating intent to do physical harm to person or building, permitted seizure of computers because they were "reasonably likely to serve as 'containers' for writings"); *Frasier* v. *State*, 794 N.E.2d 449, 454, 460 (Ind. Ct. App. 2003) (warrant authorizing search of "notes and/or records" of marijuana sales allowed police to examine computer files).

We analogize the issue (as did the judge) to that of searches of containers. The authority justifying such an analogy is well established. See, e.g., *United States* v. *Al-Marri*, 230 F. Supp. 2d 535, 541 (S.D.N.Y. 2002) (computers should be treated as if they are closed containers); *United States* v. *Barth*, 26 F. Supp. 2d 929, 936 (W.D. Tex. 1998) (analogizing closed container standards to computer files and hard drives); *People* v. *Gall*, *supra* at 153 (using container analogy in context of seizure of computers). See also *United States* v. *Ross*, 456 U.S. 798, 821 (1982) ("When a legitimate search is under way . . . nice distinctions between closets, drawers, and containers, in the case of a home, or between glove compartments, upholstered seats, trunks, and wrapped packages, in the case of a vehicle, must give way to the interest in the prompt and efficient completion of the task at hand"); *United States* v. *Upham*, 168 F.3d 532, 536 (1st Cir.), cert. denied, 527 U.S. 1011 (1999) ("There is no doubt that a warrant that contained only the second paragraph [that allowed seizure of the unlawful images] would permit an on-site search of any 'container' that might reasonably have the images concealed 'inside' — including the computer and any disks"); *United States* v. *Giannetta*, 909 F.2d 571, 577 (1st Cir. 1990) ("As to document searches especially, the easily concealed nature of the evidence means that quite broad searches are permitted. Courts have regularly held that in searches for papers, the police may look through notebooks,

reasonable expectation of privacy in his computers and disks.

journals, briefcases, file cabinets, files and similar items and briefly peruse their contents to determine whether they are among the documentary items to be seized"); *Commonwealth* v. *Signorine*, 404 Mass. 400, 405 (1989) ("It is clear that a valid search may include any area, place, or container reasonably capable of containing the object of the search"). "Computers are simultaneously file cabinets (with millions of files) and locked desk drawers; they can be repositories of innocent and deeply personal information, but also evidence of crimes. The former must be protected, the latter discovered." *United States* v. *Adjani*, 452 F.3d 1140, 1152 (9th Cir.), cert. denied sub nom. *Reinhold* v. *United States*, 127 S. Ct. 568 (2006).

While every court confronting the issue has not adopted this approach, see *United States* v. *Carey*, 172 F.3d 1268, 1275 n.5 (10th Cir. 1999) (rejecting analogy to closed containers or file cabinets as oversimplification of computer search issue, and requiring "a special approach"), the approach is by far the more practical. The reasoning sensibly acknowledges that clairvoyance cannot be expected of police officers to know in what form a defendant may maintain his records; that there is no meaningful difference to a reader between records maintained electronically and those kept in hard copies; and that, in this age of modern technology, persons have increasingly become more reliant on computers not only to store information, but also to communicate with others. For these reasons, we conclude that the warrant authorized police to seize the electronic storage media (computers and disks) within which the documents listed in the warrant may have been stored.

c. *Suppression of evidence derived from computers.* The defendant also filed a motion to suppress all evidence retrieved from the defendant's computers and disks. In his memorandum in support of the motion, the defendant asserted, among other arguments, that the seizure and the search of computers are two discrete acts, and that the latter requires a showing of probable cause for the search of each file.

The judge (who was the trial judge) held an evidentiary hearing at which the Commonwealth presented the testimony from State Troopers David McSweeney and William Donoghue. The judge made the following findings of facts, which are supported

by the evidence that the judge found credible, and we accept them. The computers and disks were transferred to the forensic laboratory of the Attorney General's high tech and computer crimes division. The police proceeded to apply for a warrant to search the computers, attaching an affidavit prepared by Detective Lieutenant William J. Powers to the warrant application. The affidavit set out information suggesting that there was probable cause to believe that evidence of the defendant's crimes (murder and various firearms offenses) would be found within the computers and disks. The affidavit requested permission to search for and seize seven categories of computer files, including any computer file relating to (1) the seven shooting victims; (2) firearms or ammunition; (3) the defendant's finances; (4) the defendant's life insurance policies; (5) the defendant's preparation of a will; (6) "[the defendant's] mental state and mental functioning prior to and during the homicides, including, but not limited to: any computer file relating to the treatment of [the defendant] by any health care professional regarding mental diseases or defects [and] any computer file relating to medications taken by [the defendant] for the treatment of any mental diseases or defects"; or (7) "the Internet activity of [the defendant] (including, but not limited to file menus, Internet navigation directories and logs, 'cookies' sent from Internet sites, 'cache' directories and files, temporary Internet directories and files, and electronic mail logs) which may identify, trace or record the fact, date, time, modification, alteration, transmission and/or receipt via the Internet (or other computer-to-computer transmission mode) of any computer files of the type described in Paragraph 2 of this affidavit." The affidavit also described the experience and training of the people who would perform the computer and disk search, including Trooper David McSweeney. The affidavit did not discuss methods investigators planned to use to search the computers and diskettes.

While Detective Powers was preparing the affidavit, investigators from the Middlesex County district attorney's office began to compile a list of keywords to be used to search the computers, based on Detective Powers's affidavit, a report from the Middlesex County sheriff's office containing statements made by the defendant while he was detained in a jail

prior to his transfer to Bridgewater State Hospital, and an evaluation of the defendant performed at Bridgewater State Hospital.

On February 21, 2001, a judge[22] issued a search warrant for the computers and disks (second warrant). The second warrant included the seven categories of computer files listed in an affidavit of Trooper McSweeney. Shortly thereafter, investigators from the district attorney's office provided Trooper McSweeney with a list of approximately 250 keywords that were pertinent to the investigation. Trooper McSweeney made a "forensic duplicate" of the computers' hard drives and storage media, essentially copying the computers' contents in order to preserve the computers in their original state, and then ran the "EnCase" program on data from two[23] of the computers seized from the defendant's apartment. EnCase pinpoints which files contain a particular keyword and then opens a preview window, which contains a small portion of each file that provides the context in which the keyword appears. From the preview window, the investigator can print the file if it contains information pertinent to the investigation. Trooper McSweeney entered the keywords into EnCase as they appeared on the list that he had received from the district attorney's office. Occasionally, Trooper McSweeney used the keywords in phrase form or altered their spelling, but he did not add or remove keywords from the list. By the conclusion of his search, McSweeney had printed approximately 750 files that contained keywords in contexts that he deemed relevant to the investigation.

The judge concluded that the portion of the second warrant authorizing police to search computer files relating to the defendant's mental state and functioning was invalid because it lacked particularity, with the exception of the two subsets of the category relating to treatment and medications concerning any mental disease or defect. The judge also concluded that the manner in which the police executed the second warrant was reasonable.

(i) *The second warrant.* Because we reject the defendant's

---

[22]The judge who issued the warrant was not the trial judge.

[23]McSweeney did not run the "EnCase" program on the remaining computers because their directory file structures revealed that their contents dated back to the early and mid-1990's.

challenges to the second warrant, we need not decide whether a second warrant was required to search the defendant's computers and computer disks. The defendant's argument that the second warrant was overbroad because it authorized a search of any computer file "pertaining to [the defendant's] Internet activity," overlooks that the remaining portion of that category limited the search of the defendant's Internet activity to the specific subject matters described in the second paragraph of Detective Powers's affidavit. As such, the challenged portion of the warrant was sufficiently particular.

The second warrant did not limit the category of documents concerning the defendant's mental state and mental functioning to the days and weeks leading up to the shooting as the original warrant had. This lack of a specific time period did not result in a lack of particularity. See *Commonwealth* v. *Cinelli*, 389 Mass. 197, 213 (1983), quoting *Commonwealth* v. *Anderson*, 362 Mass. 74, 75 (1972) (warrant must be read in "commonsense and realistic fashion"). A commonsense reading of the second warrant permitted the officers to seize only mental state and functioning evidence that related to the defendant's criminal responsibility, or lack thereof, in a reasonable time period. What is reasonable depends on the information obtained by the officers. Here, Detective Powers's affidavit in support of the second warrant set forth information that the defendant had recently been depressed, had received mental health treatment, and took medications for mental health problems. Whether such mental health problems had just emerged, or were long standing, could be important in investigating a crime where criminal responsibility is, or likely is, an issue. See *Commonwealth* v. *Urrea*, 443 Mass. 530, 533-534 (2005) (defense presented evidence on defendant's family background to support existence of mental impairment). The lack of further specificity was practical in the circumstances, and the mental health category was limited as much as possible in the circumstances. See *Commonwealth* v. *Penta*, 423 Mass. 546, 555 (1996). See also *Commonwealth* v. *Freiberg*, 405 Mass. 282, 299 (1989).

(ii) *Manner of executing the search of the computers and disks.* Pursuant to the original warrant, the officers were permitted to take possession of the defendant's computers and disks.

See *United States* v. *Al-Marri*, 230 F. Supp. 2d 535, 541 (S.D. N.Y. 2002); *People* v. *Loorie*, 165 Misc. 2d 877, 878-881 (N.Y. County Ct. 1995), and cases cited.

The removal of the computers and disks for forensic testing did not violate constitutional principles. "Often it is simply impractical to search a computer at the search site because of the time and expertise required to unlock all sources of information." *United States* v. *Hunter*, 13 F. Supp. 2d 574, 583 (D. Vt. 1998). See *United States* v. *Hill*, 322 F. Supp. 2d 1081, 1088-1089 (C.D. Cal. 2004), aff'd, 459 F.3d 966 (9th Cir. 2006), cert. denied, 127 S.Ct. 1863 (2007) (detailing burdens on police in conducting on-site search of computer, including "significant technical problems" that often arise). A seizure of a computer is similar to the seizure of a firearm that is believed to be a murder weapon. The firearm must be listed in the inventory taken from the premises in the timely return of the warrant, see G. L. c. 276, § 3A, but it may be submitted for specialized examination at an off-site forensic setting for the further extraction of evidence, such as the recovery of fingerprints, deoxyribonucleic acid, or gunshot residue, and a determination whether a weapon is a working firearm. See *Commonwealth* v. *Robles*, 423 Mass. 62, 65 n.8 (1996); *Commonwealth* v. *Campbell*, 352 Mass. 387, 402 (1967); *Commonwealth* v. *Aviles*, 58 Mass. App. Ct. 459, 463 (2003).

In conducting the actual search of the computers and disks, considerable discretion must be afforded to the executing officers regarding how best to proceed with the search. See *Commonwealth* v. *Garner*, 423 Mass. 735, 740 (1996), quoting *Dalia* v. *United States*, 441 U.S. 238, 257 (1979). Advance approval for the particular methods to be used in the forensic examination of the computers and disks is not necessary. See *United States* v. *Upham*, 168 F.3d 532, 537 (1st Cir. 1999) ("The warrant process is primarily concerned with identifying *what* may be searched or seized — not how . . .") (emphasis in original). Indeed, the judge or officer issuing the search warrant likely does not have the technical expertise to assess the propriety of a particular forensic analysis. In conducting the analysis, a cursory examination of a computer's files is permissible. See *United States* v. *Gray*, 78 F. Supp. 2d 524, 529 (E.D. Va. 1999) (holding that fed-

eral agent was "entitled to examine all of defendant's [computer] files to determine whether they contained items that fell within the scope of the warrant"). Cf. *United States* v. *Giannetta,* 909 F.2d 571, 577 (1st Cir. 1990) ("Courts have regularly held that in searches for papers, the police may look through notebooks, journals, briefcases, file cabinets, files and similar items and briefly peruse their contents to determine whether they are among the documentary items to be seized"). Just as "few people keep documents of their criminal transactions in a folder marked '[crime] records,' " *United States* v. *Hunter, supra* at 582, quoting *United States* v. *Riley,* 906 F.2d 841, 845 (2d Cir. 1990), "computer files can be misleadingly labeled, particularly if the owner of those files is trying to conceal illegal materials," *United States* v. *Gray, supra* at 527 n.5. However, if officers, in the course of conducting a lawful search, discover evidence in plain view, such evidence may be seized under the plain view exception to the warrant requirement.[24] See *id.* at 528. See also *Commonwealth* v. *Hinds,* 437 Mass. 54, 61 (2002) (applying plain view doctrine to computer search).

With these principles in mind, we add that care must be taken to minimize the intrusion of the search and the search conducted must be reasonable. Here, these safeguards were more than satisfied. A forensic duplicate was made of the defendant's computers' hard drives and storage media to preserve all original data. Further, the keyword search method resulted in a cursory inspection of only approximately 750 files out of the 100,000 files contained in the defendant's computer media, which amounted to less than one per cent of the defendant's files. We thus reject the defendant's assertion that the computer search was performed in an unreasonable manner.

3. *Witness's reference to September 11, 2001.* In his direct examination during the Commonwealth's presentation of its rebuttal evidence, Dr. Rogers made a single, isolated reference to the "September 11th attack in this country" when explaining

---

[24]Contrary to the defendant's contentions, the judge properly denied the suppression of the defendant's (1) Internet query, "how to fake mental illness"; (2) Amazon.com purchase of the book entitled Clinical Assessment of Malingering and Deception; and (3) downloading an article entitled "Psychometric Detection of Malingering," because the evidence was discovered in plain view.

the term "paranoia."[25] The defendant requested a mistrial, which was denied. The defendant argues that the judge should have declared a mistrial because, in a case involving multiple homicides, "the prejudice from such evidence was 'considerable' and violated due process."

The judge did not abuse his discretion. See *Commonwealth* v. *Amirault*, 404 Mass. 221, 232 (1989). He forcefully directed the prosecutor to ensure that the witness would avoid any further references to September 11. The judge indicated that he would give a curative instruction only if the defendant requested one, but the defendant declined to do so. Dr. Rogers's single, isolated reference did not equate the defendant's actions with the events of September 11 or compare them in any way. Rather, Dr. Rogers referred to September 11 in the context of an explanation of paranoia, as a symptom of psychosis, an illness from which the defense argued the defendant suffered. In light of the length of the trial, the amount of evidence introduced against the defendant, and the lack of a direct connection between the defendant and September 11 in Dr. Rogers's isolated statement, "it is difficult to imagine that the jury could have been unduly influenced by the witness's spontaneous remark." *Commonwealth* v. *Martino*, 412 Mass. 267, 282 (1992).

4. *Jury instructions.* The defendant argues two errors in the judge's instructions.

a. *Extreme atrocity or cruelty.* The defendant asserts that the judge violated his constitutional rights by refusing to instruct the jury that they were required to reach a unanimous verdict with respect to any *Cunneen* factor, see *Commonwealth* v. *Cunneen*, 389 Mass. 216, 227 (1983), relied on to support a conviction of murder in the first degree under the theory of extreme atrocity or cruelty. Contrary to the defendant's contention, we have considered the "recent" cases on which the defendant

---

[25]Dr. Rogers testified:

> "Paranoia is the perception that other people might mean to do you harm or are saying derogatory things about you or don't like you or in some way are trying to harm you, and so a paranoid feeling, depending on the context, may have some validity. I mean, just to explain it in general terms, after the September 11th attack in this country I think most of us felt a little paranoid, and we might have used that word, in the sense that we expected something bad or adverse to —."

relies, namely *United States* v. *Booker*, 543 U.S. 220 (2005); *Blakely* v. *Washington*, 542 U.S. 296 (2004); *Ring* v. *Arizona*, 536 U.S. 584 (2002); *Apprendi* v. *New Jersey*, 530 U.S. 466 (2000); and *Richardson* v. *United States*, 526 U.S. 813 (1999). See, e.g., *Commonwealth* v. *Perez*, 444 Mass. 143, 153-156 (2005). We repeatedly have considered and rejected the argument he makes, and once again, we "reiterate that our decisional law remains correct." *Commonwealth* v. *Pov Hour*, 446 Mass. 35, 43 (2006). See *Commonwealth* v. *Almonte*, 444 Mass. 511, 523-524, cert. denied, 126 S. Ct. 750 (2005); *Commonwealth* v. *Perez, supra*; *Commonwealth* v. *Obershaw*, 435 Mass. 794, 809 (2002); *Commonwealth* v. *Hunter*, 427 Mass. 651, 656-658 (1998).[26]

b. *Involuntary intoxication.* The defendant argues that the judge erred in failing to instruct the jury that the defendant's ingestion of Prozac "may have resulted in his involuntary intoxication," thereby rendering him unable to form the intent to commit murder in the first degree. The defendant did not request the instruction and did not object to the instructions given at trial on the grounds now argued. There was no error. The defendant's evidence did not warrant such an instruction because there was no evidence that the defendant was "compelled to ingest intoxicants unwillingly" or that he suffered "intoxicating effects from prescription medication used as instructed." *Commonwealth* v. *Darch*, 54 Mass. App. Ct. 713, 715 (2002). To the contrary, Dr. Joseph testified that in December, 2000, the defendant increased his dose of Prozac without the prescribing physician's permission or advice. Further, there was no evidence that the defendant took Prozac on December 26, 2000, or that prior ingestion of Prozac by him would have had any effect on him on December 26, 2000.

5. *G. L. c. 278, § 33E.* There is no basis for relief under G. L. c. 278, § 33E.

*Judgments affirmed.*

---

[26]Even if the instructions on extreme atrocity or cruelty contained error, the defendant's murder convictions would stand because he was separately convicted under the theory of deliberate premeditation.